**PRINEVILLE SAWMILL COMPANY, INC., Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

**Appeal No. 88–1199.**

United States Court of Appeals, Federal Circuit.

Oct. 14, 1988.

Gary G. Stevens, Saltman & Stevens, P.C., Washington, D.C., argued, for plaintiff-appellant. With him on the brief, was Ruth G. Tiger, Washington, D.C.

Katherine A. Day, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued, for defendant-appellee. With her on the brief, were John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director, Washington, D.C. Also on the brief, was James Perry, Office of Gen. Counsel, Dept. of Agr., Washington, D.C., of counsel.

Before ARCHER, MAYER, and MICHEL, Circuit Judges.

MICHEL, Circuit Judge.

Prineville Sawmill Co., Inc. (Prineville) appeals the decision of the United States Claims Court, *Prineville Sawmill Co., Inc.*

*v. United States,* 14 Cl.Ct. 186 (1988), granting summary judgment to the United States in Prineville's pre-award bid protest action against the Forest Service regarding sale of salvage timber. We reverse and remand.

## Background

On April 17, 1987, the Forest Service advertised the sale of salvage timber from the South Crater area of the Deschutes National Forest. The sale was to be conducted by an oral auction scheduled for May 19, 1987. The Forest Service sent copies of the sale advertisement and a short form prospectus to Prineville and other prospective purchasers. The advertisement included an estimate by the Forest Service of the amount of timber of the different species offered for sale. Specifically, the Forest Service estimated that the sale area contained 10,450 thousand board feet (MBF) of Ponderosa Pine, 3,650 MBF of Lodgepole Pine, and 290 MBF of White Fir and other timber. The Forest Service appraised the total value of the timber offered for sale at approximately $1.8 million.

The Forest Service also made available a sample contract of sale and bid forms for use at the auction. The prospectus, the sample contract, and the bid forms notified prospective purchasers that they should not rely upon the Forest Service's timber estimates for the total timber and individual species quantities, but should perform their own inspection and develop their own estimates. The Forest Service also notified prospective purchasers that the Service "reserved the right to reject any and all bids."

The procedure for the sale called for each bidder to submit, prior to the oral auction, a sealed bid specifying the price that the purchaser would pay per MBF of the biddable species. In accordance with standard Forest Service policy, the total value of the sealed bids would be determined by multiplying the bid rate on each species by the Forest Service's estimate of that species, and adding the total amounts bid for each species.[1] Each bidder whose total bid exceeded the Forest Service's appraised value for the timber qualified to participate in the subsequent oral auction. The total price of the oral bids would also be determined on the basis of the Forest Service's species estimates. The oral auction was to proceed at discrete bidding intervals, as long as each subsequent bid resulted in a total bid price higher than the previous bid, until no further bids were offered. Thus, the last bid properly made would also be the high bid.

Even though the Forest Service species estimates would be used in determining the total bid prices at the auction and in correspondingly determining the high bidder, the high bidder's final total bid price would not be the actual purchase price ultimately paid by that bidder (the purchaser). Rather, the purchaser would pay the Forest Service for the total amount of timber as actually measured (scaled) upon removal from the sale area, at the rates specified in the prevailing bid. Thus, the true final purchase price, and the amount that the Forest Service would receive from the sale, would not be known until the timber was removed.

Prior to the auction, Prineville obtained its own estimate of the volume of the various species at the South Crater site. Prineville estimated less Lodgepole Pine than the Forest Service. In reliance on its assumption that its estimate of the Lodgepole Pine volume was more accurate, Prineville prepared to follow a skewed bidding strategy at the oral auction, as permitted under Forest Service policy. Under such a bidding strategy, a bidder would submit an unusually high bid for the species which it believes to have been overestimated by the Forest Service and a correspondingly lower than usual bid on the remaining, more ac-

---

1. Specifically, the total dollar value of each prospective purchaser's bid would be determined in accordance with the following formula:

    Total Bid Price = ((Bid Price for Ponderosa Pine) × 10,450) + ((Bid Price for Lodgepole Pine) × 3,650) + ((Bid Price for White Fir) × 290)

    where each bid price is in dollars per MBF and the numbers represent the Forest Service estimates in MBF for the individual species.

curately-estimated species.[2] The skewed bidding strategy permits the bidder to offer the Forest Service an apparently higher overall price for the total timber than could be offered without skewing the bids. Since the actual purchase price is calculated from the scaled timber values as removed from the site, a skewed bidder awarded the contract would end up paying less for the salvage timber than would a bidder using its bid values against the Forest Service estimates. However, the bidder pays less only if its estimates were indeed more accurate than the Forest Service's.

At the timber sale, six bidders, including Prineville, submitted qualifying written bids. In the subsequent oral bidding, all six bidders kept their bid price for the White Fir constant. The five bidders other than Prineville altered their total bid prices by varying their bids on Ponderosa Pine, while keeping their Lodgepole Pine bid constant. Prineville alone, however, skewed its bid with respect to Lodgepole Pine.

Eventually, Prineville submitted the final bid of the auction. This bid reflected per MBF bid rates of $161.76 for Ponderosa Pine, $515.00 for Lodgepole Pine, and $11.15 for White Fir. When multiplied by the Forest Service species estimates, this bid resulted in a bid price of $3,573,375.50. DAW Forest Products had submitted the last previous (next highest) bid which contained per MBF bid rates of $339.00 for Ponderosa Pine, $7.00 on Lodgepole Pine, and $11.15 on White Fir, for a total price of $3,571,333.50. At the close of bidding, the Forest Service designated Prineville's final bid as being "responsive" to the Forest Service offering and designated Prineville as the highest bidder. On June 4, 1987, the Forest Service confirmed by letter that Prineville was the highest bidder.

Thereafter, prompted by Prineville's bidding strategy, the Forest Service checked its estimate of the volume of Lodgepole Pine. It determined that a variety of computational (arithmetical, transpositional, and tabular) errors had been made in estimating Lodgepole Pine. According to the Forest Service's new approximation, the sale area contained only 2,960 MBF of Lodgepole Pine, 690 less MBF than originally estimated. Assuming the revised estimate to be more accurate than the original, there was 19% less Lodgepole Pine and 5% less total timber. By letter dated July 8, 1987, the contracting officer notified Prineville that, notwithstanding the confirmed designation of Prineville as the highest bidder, the Forest Service had decided to reject all bids on the sale because of the errors in its original estimate. Specifically, the letter stated that the Forest Service errors "so flawed this sale offering that your [Prineville's] apparent high bid was not in fact the high bid."

Prineville promptly filed a complaint with the Claims Court seeking injunctive relief against readvertisement of the sale and resolicitation of bids. Relying on *Massman Construction Co. v. United States*, 60 F.Supp. 635, 102 Ct.Cl. 699, *cert. denied*, 325 U.S. 866, 65 S.Ct. 1403, 89 L.Ed. 1985 (1945), Prineville argued that once bids have been publicly disclosed, the Forest Service could reject bids only for a "cogent or compelling" reason and that the rejection of the bids for the South Crater sale was not based on a cogent or compelling reason. In response, the Forest Service argued, relying upon *S & S Logging Co. v. Barker*, 366 F.2d 617 (9th Cir.1966), and *Hi-Ridge Lumber Co. v. United States*, 443 F.2d 452 (9th Cir.1971), that an exception to the *Massman* standard permits the Forest Service an "unlimited" right to reject all bids.

The Claims Court, ruling on the parties' cross-motions for summary judgment, essentially held that the Forest Service decision to reject all bids and readvertise the South Crater sale did not require a cogent or compelling reason, but is within the discretion of the Forest Service, sustainable absent clear proof of arbitrary or capricious action amounting to an abuse of discretion. The Claims Court further held that the Forest Service's decision to reject bids was not uniquely disadvantageous to

---

**2.** Since the bid prices on the individual species are either higher or lower than what would ordinarily be offered, the term "skewed" is used to refer to the bids.

Prineville, and that therefore the Service's action was not arbitrary or capricious, and did not represent an abuse of discretion. Accordingly, the court granted the government summary judgment. Prineville appeals.

## OPINION

### A.

■ An invitation for bids issued by the government carries, as a matter of course, an implied contractual obligation to fairly and honestly consider all responsive bids. *See United States v. John C. Grimberg Co., Inc.,* 702 F.2d 1362, 1367 (Fed.Cir. 1983); *Heyer Products Co. v. United States,* 140 F.Supp. 409, 413, 135 Ct.Cl. 63 (1956); *see also Mack Trucks, Inc. v. United States,* 6 Cl.Ct. 68, 70 (1984).[3] And if this duty is breached, a bidder may rely upon the explicit grant of remedial power to the Claims Court in bid protest actions against the government, 28 U.S.C. § 1491(a)(3) (1988), and may seek equitable relief before the underlying contract is awarded. *John C. Grimberg,* 702 F.2d at 1367; *see also Mack Trucks,* 6 Cl.Ct. at 70. Also, as the Claims Court determined, government consideration of solicited bids is reviewed as to whether it was arbitrary and capricious, an abuse of discretion, and thus not in keeping with the government's fairness obligation. *See CACI, Inc.–Federal v. United States,* 719 F.2d 1567, 1573 (Fed.Cir.1983).

■ Furthermore, although the Forest Service has been given discretionary authority to prescribe rules and regulations for the sale of timber from our national forests, *see* 16 U.S.C. § 472a(a) (1985), and has, under the rules that it has promulgated, the power to reject bids, 36 C.F.R. §§ 223.100–101 (1987), the Forest Service nonetheless also has an obligation to treat fairly responsive bids it receives. In fact, the same statute specifically limits the Service's discretion in conducting timber sales by requiring that bidding methods used "insure open and fair competition." 16 U.S.C. § 472a(e)(1)(A).

■ Since the government generally has a duty to treat fairly responsive bids, and since the statute specifically requires the Service to adopt procedures which insure open and fair competition, we simply cannot accept the government's argument that there is no limitation on the right of the Forest Service to reject responsive bids it receives whenever it pleases. To the extent such rejections are determined to be arbitrary and capricious, an aggrieved bidder is entitled to equitable relief. Furthermore, in view of our conclusion that the Forest Service is obliged to treat responsive bids fairly, we must also reject the government's argument that unlimited Forest Service discretion to reject bids is mandated by the two Ninth Circuit decisions which the government relies upon for that proposition. Although this court gives due deference to the decisions of other federal circuit courts, we believe that both decisions reach the conclusion as to the Forest Service's unlimited discretion in dicta which is based in large part on unpersuasive reasoning and on a legal context and factual settings much different from the present case. Most importantly, any validity to the doctrine expressed in those decisions cannot survive following enactment in 1976 of the statute mandating open and fair competition in timber sales.

Particularly, we note that in *S & S Logging Co. v. Barker,* 366 F.2d 617 (9th Cir. 1966), the appellant brought suit directly against the individual defendants under section 4 of the Clayton Act, 38 Stat. 731 (1914), 15 U.S.C. § 15 (1964) and sections 1 and 2 of the Sherman Act, 26 Stat. 209 (1890), 15 U.S.C. §§ 1, 2 (1964), for conspiring to cancel an auction sale of timber on which S & S Logging had been the successful bidder and award the contract to other named conspirators. 366 F.2d at 618–19. In fact, the bids had been rejected because

---

**3.** Although not raised by either party as an issue in this case, Claims Court jurisdiction over the subject matter of this suit ultimately rests on the alleged breach of this implied-in-fact contract to fairly consider bids. Thus, a bidder whose bid was arbitrarily rejected has standing to sue for its bid preparation costs.

one of the available "minor" species had been left open for bidding when internal Forest Service policy required such minor species to be advertised at a fixed rate. When the Forest Service official responsible for the sale realized that the Forest Service policy had not been followed and that S & S Logging's bid for the minor species was far in excess of the standard fixed rate, he urged two of the named defendants to reject all bids and to readvertise the sale in order to prevent severe "loss to the Government." *Id.* at 623–24.

Since the individual officials, and not the Forest Service, had been named as defendants, the decision necessarily addressed the personal liability of Forest Service officials for actions undertaken in their governmental capacity. The court held that power to reject bids was generally within the authority of Forest Service officials and that, inasmuch as the defendants had been acting within the scope or "perimeter" of their governmental duties, they were immune from the antitrust charges brought against them individually. 366 F.2d at 619–20. Thus, the factual setting of the case did not present the distinct and separate legal question of whether the discretionary power of the Forest Service was indeed limitless. Nonetheless, the court offered its view that "[o]bviously ... under the regulations there is no limitation on the unqualified discretion of the Forest Service to reject all bids with or without reason." *Id.* at 624.

In *Hi–Ridge Lumber Co. v. United States,* 443 F.2d 452 (9th Cir.1971), the Forest Service had rejected all bids because the appellant, the high bidder, refused to perform under the announced terms of sale. The purchaser was to construct 10.7 miles of road, of which 1.8 miles were outside and north of the sale area. However, the appellant's planned method of removing the timber did not require construction of the northern road so it sought to avoid this provision of the contract. Eventually, in light of the appellant's continued refusal to build the 1.8 mile road

section required by the contract, the Forest Service decided to reject all the bids and reoffer the timber. 443 F.2d at 453.

In view of Hi–Ridge Lumber's refusal to comply with the contract provision, it would seem that the Forest Service's action was well within its discretion [4] and that, therefore, the *Hi–Ridge* court need not have determined the outer limits of Forest Service discretion. Nonetheless, the court chose to follow and extend its previous decision in *S & S Logging.* The court stated that under the regulations then in effect, the Forest Service could reject all bids with or without reason. 443 F.2d at 455. The court further stated that there were "no standards" under which it could review the rejection of all bids by the Forest Service since it lacked the "technical expertise" necessary "to provide an informed review of executive decision-making" and concluded that Forest Service sales should be insulated from judicial review because of the Forest Service's "continuing and comprehensive managerial function." *Id.*

We are unpersuaded by the suggestion that, because the Service possesses technical expertise and is entrusted with the continuing management of national timber, the Service may do as it pleases, and that its actions are not reviewable for basic fairness. If agency claims of "expertise" were to operate as an instant talisman permitting the agency to escape judicial review, then practically no agency action would be reviewable since, as a general matter, agencies exist for the very purpose of serving as experts and taking action in a given area of specialization. We specifically reject the notion that this court cannot provide an informed review of the fairness of the Forest Service's actions. As mentioned above, the Claims Court explicitly has been granted jurisdiction to review bid protest actions, such as the one at issue here, for fairness by the government. Furthermore, this court has jurisdiction to review bid protest decisions of the Claims Court. 28

---

**4.** Certainly, the Forest Service would not have been required to accept performance of a different contract than the one that the other bidders had bid on and which the government sought to have performed.

U.S.C. § 1295(a)(3) (Supp.1988). Since this court has been granted such review power, it may be presumed capable of performing an informed review of these matters.

With regard to legal context, it is significant in our view that both cases, *S & S Logging* and *Hi–Ridge Lumber*, predate the National Forest Service Management Act, Pub. L. No. 95–233, § 1, 92 Stat. 32 (1978) (codified in pertinent part at 16 U.S. C. § 472a(e)(1)(A)), which imposed the above-discussed limitation that Forest Service bidding practices "insure open and fair competition." To the extent the "open and fair" limitation was not legally required at the time those Ninth Circuit cases were decided, their reasoning cannot be seen as properly determining the specific obligations owed by the Forest Service in this case. That is, even assuming that the statements of the Ninth Circuit in *S & S Logging* and *Hi–Ridge Lumber* were correct with respect to there being no limitation on the Service's power to reject bids at the time those cases were decided, there now exists an explicit statutory obligation for open and fair competition to which a court must hold the government. Of course, as we have also already discussed, an implied fairness obligation arises anyway, as a matter of course, with the government's invitation for bids.

■ Based on our interpretation of the power of the Claims Court and of the obligations imposed by the Forest Service Management Act as it presently reads, and the honesty and fairness obligations otherwise owed by the government, we conclude that the Forest Service's actions in this case are subject to review and that the Forest Service's power is not limitless as the government argues, but must be able to withstand Prineville's attack that the Service's actions were arbitrary, capricious, and an abuse of discretion.

### B.

■ The issue then is whether the Forest Service abused its discretion, as a matter of law, under the circumstances presented. Specifically, in determining whether the Claims Court's grant of summary judgment to the Forest Service on this issue was proper, this court determines for itself whether the standards for summary judgment have been met. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987). The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other. *Id.* at 1391. Summary judgment should be granted only where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Id.* at 1390.

■ In reviewing the Forest Service's exercise of discretion in this case, the Claims Court utilized the criteria set forth in *Keco Industries, Inc. v. United States,* 492 F.2d 1200, 203 Ct.Cl. 566 (1974), for determining whether the Forest Service's actions were arbitrary, capricious, or an abuse of its discretion. The *Keco Industries* court set forth its criteria as general guidelines, *id.* at 1203, recognizing that "[t]here may well be no one umbrella rule or principle for all such cases." *Id.* at 1206. The relevant factors include: subjective bad faith on the part of the officials; the absence of a reasonable basis for the administrative decision; the amount of discretion entrusted to the procurement officials by applicable statutes and regulations; and proven violation of pertinent statutes or regulations. *Id.* at 1203–04. Application of these four criteria often depends on the type of error committed by the government and the factual setting of the bidding at issue, *id.* at 1204, but there is no requirement or implication in *Keco Industries* that each of the factors must be present in order to establish arbitrary and capricious action by the government.[5]

■ Applying the *Keco Industries* factors to this case leads us to conclude that the Forest Service did indeed abuse its

---

5. Accordingly, we note that the absence of any allegation or evidence of bad faith on the part of the Forest Service in rejecting Prineville's bid and cancelling the South Crater auction is not determinative.

discretion in rejecting all bids in the South Crater timber sale.

Turning first to the latter two factors from *Keco Industries,* we observe again that Congress did not vest unlimited discretion in the Forest Service officials to reject responsive bids in timber sales. Nor do we believe that the express reservation contained in the advertisement in which the Forest Service reserved the right to reject all bids allows the Service the discretion to be arbitrary or capricious in rejecting all bids. If the Service could free itself from statutory obligations merely by written warnings to parties with whom it deals, statutes of the kind at issue here would have no binding significance. Congress clearly limited the Forest Service's still-considerable discretion by the explicit requirement that it "insure open and fair" bidding. Thus, to the extent that the Forest Service failed to insure fair and open bidding, it was acting either outside the scope of its discretion or in violation of the statutory mandate of 16 U.S.C. § 472a(e)(1)(A).

In *Massman,* the Court of Claims observed that cancelling a sale after the opening of sealed bids is unfair to the highest bidder as it reveals the bidder's prices and bidding approach to the other bidders, this information being useable by the other bidders in a subsequent reoffering. 60 F.Supp. at 643. Prineville argues that to cancel a sale after the bidders have revealed their offers and their bidding patterns in an open auction, as the Forest Service did in this case, can significantly undermine the fairness of that form of sale as well. The Claims Court disagreed, holding instead that the interest of the bidders in an oral auction in avoiding disclosure was less than it would have been in a sale involving only sealed bids, and that, therefore, no unfairness to Prineville resulted from the cancellation in the present case. In its view, "each bidder [at an oral auction] has openly competed, and knows his competitor's position," i.e., can assess its competitor's position during the auction. And "each bidder can change his position based upon that information, thereby eliminating the opportunity for suffering severe disadvantage."

However, at least in the present case, the opportunity for competitors to know and appreciate the positions of the other bidders could not fully present itself until after the oral auction was completed, and, as in the case of completely sealed bids, a bidder's competitive advantage could be lost only by post-sale acquisition by other bidders of knowledge regarding its bidding position. It would be virtually impossible for one bidder to determine the reason for another bidder's skewed bidding and to switch its own bidding strategy during the brief intervals between the bids being made while the oral auction was in progress. But as Prineville rightly stresses, a post-auction cancellation and reoffering gives the other bidders the chance and the time to analyze the prior bidding, including the successful bidder's bidding strategy, and change their strategies. Accordingly, in our view, the differences between a sealed bid and an oral auction which the Claims Court concluded distinguished the present situation from that discussed in *Massman* and eliminated the unfairness stemming from a sale cancellation disappear when, at most, only partial indicators of competitors' positions can be disclosed during oral bidding.

As the facts of this case demonstrate, the high bidder at an oral auction can be just as disadvantaged by a sale cancellation after the end of the auction as would a high bidder following the opening of sealed bids. Having been alerted to possible favorable bidding opportunities, such as discrepancies in the government's estimates, by the skewed bidding strategy employed by Prineville, the nonprevailing bidders would be motivated, as was the Forest Service itself here, to conduct further investigation prior to the reoffering in order to determine the basis for the skewed bidding by Prineville. As long as at least one other bidder learned of the reason for Prineville's skewed bidding strategy in the original auction, then Prineville's "advantage," gained by Prineville's independent research undertaken as recommended by the Forest Service itself, would be lost.

The *Keco Industries* court noted that "proof that there was 'no reasonable basis' for the administrative decision will also suffice [to show arbitrary and capricious conduct], at least in many situations." 491 F.2d at 1203–04. The government asserts that the Forest Service's rejection of all of the South Crater sale bids was appropriate —i.e, reasonable—because the Service was required, under its regulations, to award the timber contract "based on the most accurate information available to the Forest Service" and to ensure that bidders were not prejudiced and that the competition was fair to all bidders. The government further asserts that the avoidance of prejudice to Prineville cannot justify an otherwise improper procurement action. However, in our view, Prineville has clearly shown that the Forest Service's decision to reject all bids was, under the circumstances presented here, without reasonable basis.

From the outset of the bidding process at issue here, both the government and the bidders understood that the true amount of each timber species would not be ascertained until the high bidder actually removed the timber from the sale site. Any estimate, whether by the Forest Service or by a prospective purchaser, whether before bidding or after bidding, would remain simply that—an estimate which would be almost certain to be different from the actual timber removed from the site. The government admits that "the Forest Service timber auction is not a perfect system" and "does not always return perfect results." The government acknowledges that the actual timber amounts ultimately removed from the site may reveal that the government would have received more money had the bid rates of a different (lower) bidder been applied to the actual volume. The government further concedes that, should that occur, it is nevertheless bound to "award" the sale to the highest bidder as determined at the auction in keeping with the Forest Service estimate.[6] Yet the Service nevertheless seeks to accomplish,

through amending its estimate upon which the auction bidding was based, that which it could not accomplish once the actual volume of timber was ascertained, and with no assurance that its new estimate might not contain enough deviation from the actual timber volume to allow skewed bidding and justify another "20/20 hindsight" bid cancellation. In our view, this is clearly unreasonable.

Furthermore, we must disagree with the government's position that the present circumstances indicate that its timber estimates supplied in the original bidding documents were unreasonably inaccurate or based on a gross miscalculation, clear error, or a patent mistake. *Cf. Timber Investors, Inc. v. United States,* 587 F.2d 472, 476, 218 Ct.Cl. 408 (1978) (grossly erroneous estimates can support a reformation claim). Assuming the government's second estimate to be completely accurate, the "error" of the government's initial volume estimate for Lodgepole Pine was 19%, and the error for total timber was only 5%. Guidelines in the Forest Service Manual relating to timber estimates as were made in this case indicate that such estimates should be accurate to within 20% for every 95 of 100 "cruises" (estimates), and accurate to within 10% for every 67 of 100 estimates. Variations of plus or minus 10% are common. *See Caffall Bros. Forest Products, Inc. v. United States,* 678 F.2d 1071, 1077, 230 Ct.Cl. 517, *cert. denied,* 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982). While not carrying the binding legal significance of a formal regulation, the Forest Service guidelines nevertheless indicate that the deviation of the Lodgepole Pine volume estimate between the Forest Service's first and second estimates was not of such magnitude to render the Service's initial estimate, viewed on its own, grossly inaccurate. *See Timber Investors,* 587 F.2d at 477 & n. 6.

The government asserts that it would "take little imagination" to determine what

---

6. The government's concession is actually not that bold since the true timber volume is not known until the contract is awarded and the high bidder does the actual cutting. After the

timber is cut and removed by the high bidder, changing the award of the contract to another bidder would not appear to be a real option.

Prineville's position would be if the erroneous estimate had been to its disadvantage, thus intimating that in such an instance Prineville would have sought relief based on the result of deviations between the actual volume of timber found, if this amount differed from that specified by the government and therefore caused financial loss to Prineville. *See, e.g., Caffall Bros.,* 678 F.2d 1071 (Ct.Cl.), *cert. denied,* 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982); *Webco Lumber, Inc. v. United States,* 677 F.2d 860, 230 Ct.Cl. 457 (1982); *Russell & Pugh Lumber Co. v. United States,* 290 F.2d 938, 154 Ct.Cl. 122 (1961). However, where, as here, estimates supplied by the government are not warranted for accuracy, but their accuracy is expressly disclaimed, and where bidders are encouraged to conduct their own volume surveys, it also takes little imagination to determine the likely result of a suit against the government alleging reliance on its estimates and seeking damages for the alleged misrepresentation. *See, e.g., Caffall Bros.,* 678 F.2d at 1078 (where no warranty of estimate and where plaintiff told to rely on own estimate, no recovery for shortfall of 26.4%); *Webco Lumber,* 677 F.2d at 862, 863 (in lump sum sale where Forest Service estimate was not warranted for accuracy, contractor could not maintain claim against the government based on 31% difference between volume estimate and actual timber removed).

While it is clear that the Forest Service in this case did not intend its estimate to be a guarantee or warranty of quantity, the government agrees that the estimate must be viewed as serving some purpose. *See Womack v. United States,* 389 F.2d 793, 801, 182 Ct.Cl. 399 (1968) (if the reasonable bidder not entitled to rely on government estimates as honest, informed conclusions, inclusion of estimate would be surplusage at best or deception at worst). We completely agree. The government estimate served not as a guarantee of quantity, but as the basis for calculating each bidder's total bid during the oral auction and the bidders, including Prineville, were certainly entitled to rely on it as being used for that purpose. *Cf. Everett Plywood & Door Corp. v. United States,* 419 F.2d 425, 431–33, 190 Ct.Cl. 80 (1969).

Nevertheless, the Claims Court accepted and relied on the government's bid "recalculation" which indicates that Prineville's bid would have been $348,478 lower than that of the "apparent second high bid" if the revised Forest Service estimate had been used in place of its original estimate. In fact, despite the government's recognition that the bid of the actual purchaser may not ultimately return the most money to the government once the actual timber volumes are determined in the field, the government asserts that its new estimate "proves" that its rejection of the bids was reasonable and proper since "Prineville was not the highest bidder." In our view, bids on the individual species made at the oral auction cannot be divorced from the volume estimates on which they were based at the time of the auction. Once the volume estimates on which the total bid is determined are changed, bids on the individual species which were based on the former volume estimates become meaningless. Rather than proving that Prineville was not the highest bidder, the government's arguments and actions come much closer to "proving" that its reason for cancelling the sale was not to ensure that the competition was fair and that the bidders were not prejudiced, but simply to get even more money for its timber.[7]

Our conclusion that the Forest Service abused its discretion in cancelling the South Crater timber auction under the circumstances of this case does not mean that the Forest Service may never cancel an oral auction once the oral bidding has been

7. Significantly, Prineville's final bid, as well as those of the last bidders, exceeded the Forest Service's appraised value of $1.8 million for its estimated volume of timber in the South Crater sale area by more than $1.5 million. There has been no showing that the purchase price likely to be derived from using Prineville's bid and the recalculated volume estimate will not also result in a bid price substantially above the appraised value for the timber in the sale area. Thus, the Forest Service will apparently still realize a substantial "profit" on the timber sale, without having to reject the bids of those who "bared all" at oral auction.

concluded and the high bidder determined. As is to be expected when this court undertakes the narrow scope of review accorded this court of agency decisions awarding contracts, a conclusion of an abuse of discretion by the agency will be made only upon a strong showing by the rejected bidder. Indeed, there are many cases which, under the reasoning here, would not result in a conclusion that the Service abused its discretion. For example, the situation leading to skewed bidding in the *S & S Logging* case resulted from a violation of Forest Service policy which affected all bidders equally. Furthermore, unlike the present case, the advantage gained by the prevailing bidder in *S & S Logging* did not stem from its own efforts to ascertain "better" estimates of the timber volumes at the site. Similarly, cancellation of a sale after the completion of bidding would likely not create unfairness to the highest bidder if the bidder's own actions occasioned the cancellation, as occurred in *Hi–Ridge Lumber* where the high bidder sought to avoid clear requirements of the contract. Here, however, Prineville's actions did not cause the cancellation of the sale. Instead, the Forest Service's own estimating errors were the basis for its decision to cancel and, in fact, the Service was alerted to its own estimation errors only by Prineville's permissibly skewed bid.

Additionally, we note that the Forest Service at any time between its initial cruise and the oral auction could have checked its records and discovered the computational errors it belatedly discovered here and seeks to employ as justification for cancelling the sale and depriving Prineville of the legal entitlement rightfully accruing from its high bid. Had the Service acted sooner, this would have been a different case. All bidders would have had the corrected Service estimate and would have been able to formulate bidding strategies in accordance with that corrected estimate. As it happened, however, the Service simply waited too long. To allow its belated review of its own cruise records to deny Prineville the contract would simply be unfair to Prineville and contrary to the statutory requirement of "open and fair competition."

Finally, in our view, since the Forest Service was aware of the limitations or "imperfections" of its own oral auction as a means for ascertaining the high bidder and eventual purchaser, the Forest Service must be considered as assuming the risk that its estimates might not be as accurate as those of the bidders and could result in the Forest Service receiving less than it might have had the "perfect" estimate been made prior to the auction. To the extent the Service felt compelled to reduce its risk, it was totally free to invest the necessary time and energy in order to obtain a more accurate timber estimate than it obtained, and it need not have cancelled the auction after all its provisions had been complied with by Prineville and the other bidders. Under the circumstances of this case, the Forest Service's decision to reject all the bids can only be viewed as an abuse of discretion.

## CONCLUSION

Accordingly, the decision of the Claims Court granting summary judgment to the government is reversed and remanded for further proceedings not inconsistent with the foregoing opinion.

**REVERSED AND REMANDED.**