METRIC SYSTEMS CORPORATION,
Plaintiff,

v.

The UNITED STATES, Defendant,

and

Harris Corporation, Intervenor.

No. 98–616C.

United States Court of Federal Claims.

Nov. 13, 1998.

Frank J. Costello, Washington, DC, attorney of record for plaintiff. Zuckert, Scoutt

& Roasenberger, L.L.P.; Alan M. Rotach, of counsel.

Erin E. Powell, Department of Justice, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. David M. Cohen, Director, Kathryn A. Bleecker, Assistant Director, and Bryan R. O'Boyle, Air Force Legal Services Agencies, Commercial Litigation Branch, Arlington, VA, of counsel.

Richard Lee Moorhouse, Washington, DC, attorney for Intervenor, Harris Corporation; Holland & Knight, L.L.P., of counsel.

## OPINION

FUTEY, Judge.

This post-award bid protest case is presently before the court on the parties' cross-motions for summary judgment on the administrative record. Plaintiff argues that defendant's decision to award a contract to intervenor, Harris Corporation (Harris), on a sole-source basis was arbitrary, capricious, and otherwise not in accordance with law. Defendant and Harris counter that the administrative record adequately explains defendant's determination to award the subject sole-source contract to Harris.

### Factual Background

The Mini–MUTES is a radar simulator which emits electronic warfare threats currently utilized on Air Force training ranges.[1] Specifically, the system replicates threats pilots might be expected to face in combat, such as surface-to-air missiles. Each system consists of one Master Control Group (MCG) and up to five Remote Emitter Units (REU). The MCG controls the REUs, which emit electronic signals that simulate different threat signal combinations. The Mini–MUTES was initially produced by General Dynamics Corporation pursuant to a 1986

contract. Harris was awarded a competitive follow-on production contract in 1990.

The Mini–MUTES was deemed obsolete in 1993 because the central processing units (CPUs) were outdated and its bus, which is the electronic pathway connecting the MCG with the REUs, was inadequate. Defendant did not upgrade the system at that time, however, as it lacked the necessary funds.

Beginning in 1995, and continuing through mid–1997, defendant conducted advanced threat feasibility studies, explored joint initiatives, evaluated existing equipment and systems, and conducted informal market surveys within the industry. As a result of this effort, defendant concluded that a modification of the Mini–MUTES to add advanced threat capabilities would be more prudent than purchasing and deploying new threat simulators.[2] In this regard, defendant determined there was "a need for a reactive threat capability enhancement to provide feedback to aircrews to include[:] electronic counter measures, expendables, maneuvers, and terrain masking."[3] Significantly, defendant identified the need to improve Mini–MUTES as "urgent," and established September 2001 as the deadline for fielding the new system.[4] Moreover, defendant found that without modification, "the possibility exists that the first time ... aircrews will be exposed to advanced threats will be in actual combat versus on a training range."[5]

In January 1997, prior to defendant's determination to modify Mini–MUTES, the Defense Advanced Research Projects Agency (DARPA) announced its Dual Use Applications Program for fiscal year (FY) 1997. Under the program's Commercial Operation and Support Savings Initiative (COSSI), contractors were asked to propose methods of inserting commercial technology into fielded military systems. Harris responded to the COSSI solicitation by proposing to replace

---

1. "Mini–MUTES" is an acronym for Miniature–Multiple Threat Emitter System. Administrative Record (A.R.) at 89.

2. As part of its surveys, defendant considered plaintiff's I–Band Upgrade, which plaintiff had developed for the British Ministry of Defense. Defendant, however, concluded that the system was not feasible. *Id.* at 28.

3. *Id.* at 89.

4. *Id.* at 28, 89.

5. *Id.* at 89.

the existing obsolete CPU and bus in the Mini–MUTES with a commercial open architecture processor and bus system.

On May 5, 1997, defendant announced its intention to negotiate with Harris a COSSI grant. These negotiations resulted in a COSSI agreement between Harris and defendant, wherein Harris agreed to perform a fourteen-month research project funded by DARPA.[6] Pursuant to the terms of the COSSI agreement, entered on September 11, 1997, Harris agreed to contribute $603,267, and defendant agreed to contribute $1,485,190 for the successful development of a working commercial off-the-shelf replacement for the current processor. In addition, the agreement provided that, although defendant retained certain "march-in rights,"[7] Harris retained "the entire right, title, and interest throughout the world to each subject invention" developed under the COSSI agreement.[8]

Even before Harris and defendant entered into the COSSI agreement, on May 16, 1997, defendant entered into a Supplemental Agreement with Harris, modifying its existing follow-on production contract for the original Mini–MUTES. This modification, entitled "Advanced Change Study Notice" (ACSN) sought to demonstrate improved tracking capabilities of the Mini–MUTES. In particular, Harris was to "perform a demonstration of the proof-of-concept system in order to verify that a tracking upgrade field kit can be implemented on the Mini–MUTES and track an aircraft traveling at 540 [knots true air speed] in a tangential fly-by."[9]

On July 2, 1997, defendant's Air Force Aeronautical Systems Center (ASC) issued a Commerce Business Daily (CBD) announcement that it was going to award the advanced threat modification contract to Harris on a sole-source basis. Plaintiff objected. The parties met in late August 1997 and discussed the possibility that competition for the Mini–MUTES modification effort was available. Sometime after this meeting, program responsibility was transferred from ASC to defendant's Air Force Sacramento Air Logistics Center (SM–ALC). Nevertheless, on October 15, 1997, ASC informed plaintiff that the CBD announcement was "no longer valid and [was] considered withdrawn."[10] Further, plaintiff was informed that "[i]n the event a revised Mini–MUTES requirement is identified, funded and forwarded to this office for action, it will be processed in accordance with Federal Acquisition Regulations Part 5, as supplemented."[11]

On January 18, 1998, SM–ALC, the entity to which program responsibility was transferred, prepared a justification and approval (J & A) for the sole-source award of the advanced threat upgrade contract to Harris. As justification for awarding the contract to Harris, the J & A identified the COSSI agreement, the ACSN, and Harris' respective proprietary data in those agreements as compelling reasons for the sole-source award. Specifically, the J & A noted the unavailability of data with respect to the agreements and found that "[a] full and open competition will delay the [research and development] phase an estimated two years or more and result in additional costs of $2.5 million to duplicate the on-going development efforts that Harris Corporation is currently working under separate contracts."[12] The J & A further identified logistics considerations that would prevent another contractor from completing the on-going development efforts.

---

6. Pursuant to the COSSI grant, the contractor is responsible for developing, manufacturing, and delivering a prototype kit. In the first stage of the project, defendant and the contractor share the cost of developing and testing the prototype. If the first stage is successful, the contractor may sell the prototypes to defendant without the need for a re-competition. See id. at 163.

7. A "march-in right" requires Harris to agree that, with respect to any invention in which Harris retains title, defendant has the right to require Harris to grant a non-exclusive license to a responsible applicant, upon terms that are reasonable under the circumstances. Id. at 124.

8. Id. at 121.

9. Id. at 741.

10. Id. at 102.

11. Id.

12. Id. at 48–49.

After reviewing these circumstances, the J & A expounded on the rationale for awarding the advanced threat upgrade to Harris on a sole-source basis. In support of this decision, the J & A states, in pertinent part:

> Harris Corporation is the only known source capable of satisfying all the program requirements at this time. Harris Corporation is the current Mini–MUTES manufacturer and has the necessary skills, equipment, and capabilities in-place to accomplish the required system modifications. Harris Corporation possesses a unique knowledge of the existing system. They [sic] have extensive experience in developing and producing modifications for Mini–MUTES. The required Mini–MUTES modifications must not only integrate with existing Mini–MUTES hardware and software, but interface with the on-going computer replacement and tracking upgrade efforts currently on-contract with Harris Corporation. Only Harris Corporation can concurrently perform the required Mini–MUTES modifications with on-going development of a system computer replacement and tracking upgrades and meet the delivery requirements. System integration is the key risk area for the Mini–MUTES modification, including integration of available advanced threat transmitter technology. Harris Corporation is best qualified to perform as the responsible total system integrator.[13]

A synopsis of the proposed sole-source award was presented in the CBD on February 11, 1998. The CBD notice stated that defendant would consider all proposals received within twenty days in order to determine whether to conduct a competitive procurement. More than twenty days later, on March 5, 1998, plaintiff filed an "objection and protest" with defendant, maintaining that a number of firms, including itself, could satisfy defendant's requirements. Defendant responded on March 23, 1998, explaining that, although it could compete the advanced threat modification contract alone, this would require defendant to integrate the advanced threat transmitters with the ongoing CPU and bus interface development in order to meet the mission requirement date. In light of these concurrently undertaken tasks, defendant stated that it did not have the resources to act as an integrator.

Subsequent to the response from defendant, plaintiff filed a protest with the General Accounting Office (GAO). Before the GAO, plaintiff argued that a number of sources, "including itself, are capable of providing the entire modification effort—the CPU and bus upgrade, the tracking upgrade, and the advanced threat modifications—and that [defendant] should have terminated Harris' ongoing efforts and held a competition for the entire modification program."[14] The GAO rejected plaintiff's arguments and specifically found that: (1) adopting the course suggested by plaintiff jeopardized defendant's initial operational capability date of September 2001; and (2) plaintiff's proposed solution would result in significant additional costs to duplicate Harris' efforts. The GAO concluded that "the only contractor that could provide all of these efforts concurrently and still meet the 2001 target date was Harris."[15] Plaintiff's protest was denied on July 2, 1998. On July 13, 1998, defendant awarded the sole-source contract to Harris. The total estimated cost of the contract is $49.9 million.

Plaintiff filed suit in this court on July 29, 1998, seeking injunctive relief and a declaration stating that the award of the contract to Harris was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law. On September 16, 1998, defendant and Harris filed motions for summary judgment on the basis of the administrative record, and on September 18, 1998, plaintiff filed its motion for summary judgment.[16] On October 14, 1998, the court heard oral argument on the parties' motions.

13. *Id.* at 49.

14. *Id.* at 203.

15. *Id.*

16. Although plaintiff captioned its motion as one for summary judgment, plaintiff filed the motion pursuant to RCFC 56.1, which is a motion for summary judgment based upon the administrative record.

## Discussion

Motions for judgment upon the administrative record are treated in accordance with the rules governing motions for summary judgment. RCFC 56.1; *see Nickerson v. United States*, 35 Fed.Cl. 581, 588 (1996). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS*, 998 F.2d 979 (Fed.Cir. 1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc., v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed. Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed. Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987)). Summary judgment will not necessarily be granted to one party or another simply because both parties have moved for summary judgment. *Corman v. United States*, 26 Cl.Ct. 1011, 1014 (1992) (citing *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692–93 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States*, 33 Fed.Cl. 514, 518 (1995). It therefore does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman*, 26 Cl.Ct. at 1014).

Congress amended the Tucker Act in 1996 by granting this court jurisdiction to hear post-award bid protest actions. 28 U.S.C.A. § 1491(b)(4) (West Supp.1997). The court reviews the challenged agency decisions according to the standards set out in the Administrative Procedures Act (APA), 5 U.S.C. § 706 (1994). The court must determine whether defendant's actions toward plaintiff were:

(A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law....

5 U.S.C. § 706(2).

In determining whether the agency has acted arbitrarily or capriciously toward plaintiff, the court must consider four factors. *Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200, 1203 (Ct.Cl.1974). Specifically, the court must determine whether: (1) there was subjective bad faith on the part of the procuring officials; (2) there was a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes or regulations were violated. *Id.*, 492 F.2d at 1203–04; *see also Aero Corp., S.A. v. United States*, 38 Fed. Cl. 739, 749 (1997). There is, however, "no requirement or implication ... that each of the factors must be present in

order to establish arbitrary and capricious action by the government." *Prineville,* 859 F.2d at 911.

When reviewing agency action, the APA requires a "thorough, probing, in-depth review" to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In examining an agency's procurement action, the agency is given wide discretion in the application of procurement regulations. *Bellevue Bus Serv., Inc. v. United States,* 15 Cl.Ct. 131, 133 (1988); *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 725 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988).

In this regard, the court cannot substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions. *CRC Marine Servs., Inc. v. United States,* 41 Fed.Cl. 66, 83 (1998). Indeed, "[t]he court should not substitute its judgment on such matters for that of the agency, but should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable." *Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983). As long as a rational basis is articulated and relevant factors are considered, the agency's action must be upheld. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). Moreover, "[a] court's reluctance to interfere with the executive procurement process should be especially strong where, as here, the ... [GAO] has made a determination upholding the procurement officials on the merits." *E.W. Bliss Co. v. United States,* 33 Fed.Cl. 123, 134 (1995) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1304 (D.C.Cir. 1971)); *see also Nationwide Roofing & Sheet Metal Co. v. United States,* 14 Cl.Ct. 733, 737 (1988).

The Competition in Contracting Act (CICA) requires the head of an agency to utilize competitive procedures and obtain full and open competition. 10 U.S.C. § 2304(a)(1) (1994). CICA, however, also allows for procedures other than competitive procedures when:

(1) the property or services needed by the agency are available from only one responsible source or only from a limited number of responsible sources and no other type of property or services will satisfy the needs of the agency.

§ 2304(c). In awarding a sole-source contract, the contracting officer must prepare a written justification and have the justification approved by an agency official designated by statute. § 2304(f)(1)(A). Further, the justification must include, among other things, "[a] demonstration that the proposed contractor's unique qualifications or the nature of the acquisition requires use of the authority cited." 48 C.F.R. § 6.303–2(a)(5) (1995).

The J & A drafted in the case at bar specifically found that the Mini–MUTES contract will require Harris "to provide total system performance responsibility ... to ensure a seamless integration of all required modifications with existing Mini–MUTES hardware and software as well as interface[ ] with on-going related Mini–MUTES efforts" such as the COSSI agreement and the ACSN.[17] Moreover, the J & A noted that the "effort is dependant upon interfacing with these on-going developments."[18] Importantly, the J & A further found that "[s]ystem integration is the key risk area for the Mini–MUTES modification."[19] Relying upon 10 U.S.C. § 2304(c)(1), "only one responsible source," the J & A concluded that Harris "is best qualified to perform as the responsible total system integrator."[20]

Plaintiff, however, argues the J & A's reliance upon the "one responsible source" argument is without merit. In support of its position, plaintiff maintains that the mere existence of proprietary rights do not justify the exception. Plaintiff takes issue with the

---

17. A.R. at 47.

18. *Id.*

19. *Id.* at 49.

20. *Id.* at 48–49.

J & A's identification of Harris as the one responsible source to the proprietary rights generated by the COSSI agreement and the ACSN. With regard to the ACSN, plaintiff maintains that all data was to be delivered by September 30, 1997. According to plaintiff, this means "all of the pertinent tracking data relevant to the tracking upgrade." [21]

Although the terms of the ACSN indicate that certain "descriptive data" must be delivered by September 30, 1997,[22] the J & A specifically found that "no technical data [is] available for purchase under the ACSN since it was a *demonstration only* and design was corporate funded." [23] The J & A interpreted "demonstration only" to mean that Harris is not required to "provide data until the production stage of [the contract] which is anticipated in FY 01." [24]

Moreover, with regard to the COSSI agreement, although defendant retained certain "march-in rights," Harris retained "the entire right, title, and interest throughout the world to each subject invention" developed under the COSSI agreement.[25] The J & A specifically found that, pursuant to stage 1 of the agreement, "there is no data requirement beyond commercial manuals and reprocurement [sic] data is not authorized for purchase." [26] The J & A thus concluded: "Due to this limited data availability, necessary computer interface control specification documentation will not be available until stage 2 production in FY 01." [27] Indeed, Harris stated at oral argument:

> In terms of the data rights under [the COSSI agreement] ... Harris would never have gone into an agreement [if] it had thought for a moment that its proprietary dat[a], which it was using and developing all along, would have to be forcibly given to a competitor. This was not the understanding at all.[28]

Because defendant was concerned about the proprietary rights to data with regard to the COSSI agreement and the ACSN, it could reasonably rely upon this concern as justification for awarding the sole-source contract to Harris. In this regard, the J & A states:

> The required Mini–MUTES modifications must not only integrate with existing Mini–MUTES hardware and software, but interface with the on-going computer replacement and tracking upgrade efforts currently on-contract with Harris Corporation. *Only Harris Corporation can concurrently perform the required Mini–MUTES modifications with on-going development of a system computer replacement and tracking upgrades and meet the delivery requirements. System integration is the key risk area for the Mini–MUTES modification,* including integration of available advanced threat transmitter technology.[29]

The cited language clearly indicates that both timeliness and system integration are critical for fielding the system on schedule. Thus, plaintiff's argument that the J & A does not adequately explain defendant's decision is without merit.

Plaintiff argues, however, that if the proprietary data is a problem in this case, the problem was created solely by defendant's lack of advanced planning. In this regard, plaintiff asserts that defendant intended to sole-source the contract to Harris all along, and merely used the COSSI agreement and the ACSN as a pretext.

With reference to this argument, CICA provides that, in the event defendant decides to award a contract using other than competitive procedures, defendant may not do so "on the basis of the lack of advanced planning." § 2304(f)(5)(A). In the case at bar, however, defendant's advanced planning is

**21.** Plaintiff's Motion for Summary Judgment (Pl.'s Mot.) at 6.

**22.** A.R. at 735.

**23.** *Id.* at 48 (emphasis added).

**24.** *Id.*

**25.** *Id.* at 121, 124.

**26.** *Id.* at 48.

**27.** *Id.*

**28.** Transcript (Tr.) at 75.

**29.** A.R. at 49 (emphasis added).

explained in the J & A. Specifically, the J & A states, in pertinent part:

> The RTS [Range Threat Systems] SPO [Systems Program Office] engaged in a strategic planning process to explore options to satisfy identified training deficiencies on Combat Air Force (CAF) training. RTS SPO research efforts included advanced threat feasibility studies, exploration of joint initiatives with other military services, evaluation of existing equipment/systems, and informal market surveys with industry.
>
> . . . .
>
> During the period of Dec. 95—May 97, RTS SPO personnel contacted Army, Air Force, Navy and OSD personnel to ascertain the status of existing advanced threat systems and on-going and/or proposed development of new advanced threat systems in both the testing and training communities. . . . In addition, the RTS SPO conducted informal industry surveys of existing products of known threat simulator manufacturers and suppliers.[30]

The cited language adequately demonstrates that defendant engaged in reasonable advanced planning. This conclusion is consistent with the findings of the GAO, wherein the GAO specifically found that "the record is replete with evidence of detailed, long-term procurement planning."[31] *See Cincom Sys., Inc. v. United States,* 37 Fed.Cl. 663, 676 (1997) ("[w]hile the court is not bound by a determination of the GAO, the court may rely upon such a decision for general guidance to the extent it is reasonable and persuasive in light of the administrative record") (citing *Honeywell, Inc. v. United States,* 870 F.2d 644, 649 (Fed.Cir.1989)); *see also Cubic Applications, Inc. v. United States,* 37 Fed. Cl. 339, 342 (1997).

Plaintiff also argues that defendant did not conduct a market survey as required by CICA. According to plaintiff, the only survey conducted by defendant regarding Mini–MUTES related to options other than modifying the system.

CICA requires the J & A to include "a description of the market survey conducted or a statement of the reasons a market survey was not conducted." 10 U.S.C. § 2304(f)(3)(D). The J & A prepared for the instant contract describes defendant's compliance with this requirement. It specifically states that "research efforts included advanced threat feasibility studies, exploration of joint initiatives with other military services, evaluation of existing equipment/systems, and informal market surveys with industry."[32]

Moreover, the administrative record cites to a meeting between defendant and George Lee, plaintiff's Vice President and Director, wherein the parties discussed possible sources for defendant's advanced threat study. The notes of the meeting state:

> George Lee of Metric came to our office and told us about his products. They consist of several threat simulators including some advanced threats. . . . The idea was not accepted because it does not fill the requirement to *mod* the Mini–MUTES.[33]

Although "mod" is not defined, Harris noted at oral argument "that 'mod' only means 'modify.' "[34] This interpretation is supported by plaintiff's own submissions. Specifically, the affidavit of Mr. Lee provides, in pertinent part:

> On or about April 11, 1997, I received a call from the office of Lt. Col. B.K. Knight, the project manager at the Sacramento Air Logistics Center . . . requesting a briefing on the advanced threats we had developed for the British [Ministry of Defense]. . . . Lt. Col. Knight explained that the Air Force was looking at a multitude of future options to add an advanced threat training capability, *including modification* of the existing Mini–MUTES.[35]

---

**30.** A.R. at 50–51.

**31.** *Id.* at 204, n. 3.

**32.** *Id.* at 50.

**33.** *Id.* at 747 (emphasis added).

**34.** Tr. at 66.

**35.** Pl.'s Mot., Exhibit 1, at ¶ 4 (emphasis added). Mr. Lee also stated that there was no "inquiry regarding [plaintiff's] ability to modify Mini–MUTES." *Id.*

Thus, the administrative record adequately demonstrates that defendant's survey included inquiries regarding the modification of Mini–MUTES. Accordingly, plaintiff's argument that defendant did not conduct a market survey as mandated by CICA must fail.

Plaintiff also posits that the Harris contract was not approved by the proper agency official. According to plaintiff, contracts that exceed $50 million must be approved by the Assistant Secretary. In this case, plaintiff suggests that the total contract price was estimated at $49.9 million in order to circumvent this requirement. Plaintiff further argues that the $1.5 million cost of the COSSI agreement should be added to the estimated cost of the sole-source contract, thereby exceeding the $50 million threshold for senior procurement executive approval. Defendant counters that the proper official approved the J & A.

CICA requires, in the case of contracts exceeding $10 million and less than $50 million, the senior procurement executive of the agency to authorize the contract. 10 U.S.C. § 2304(f)(1)(A)(ii) (1994). In this case, that person is the Designated Acquisition Commander, Major General Eugene Tattini. Major General Tattini, indeed, authorized the J & A. In addition, defendant noted at oral argument that the Purchase Request for this sole-source contract specifically states "the total amount of this purchase request is [not to exceed] $49,900,000.00 without authorization. . . ." [36]

Further, plaintiff has not alleged any bad faith which would indicate that defendant valued the instant contract merely to circumvent the stricter authorization requirement of CICA. See *Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756, 770 (Ct.Cl.1982) (the plaintiff must present "well-nigh irrefragable proof" that the government acted in bad faith). In this regard, plaintiff was quite clear at oral argument that it was not alleging any bad faith.[37] Plaintiff has not provided the court with any support for its assertions, beside conjecture, which supports its position. Thus, the court concludes the proper official authorized the sole-source contract to Harris.

Lastly, plaintiff asserts Harris may be able to shift work from either the COSSI agreement or the ACSN to the sole-source contract in such a manner that Harris would be fully or partially reimbursed for such costs. According to plaintiff, this situation creates an organizational conflict of interest which requires a waiver by the head of the agency. Defendant maintains that the concerns raised by plaintiff are not a conflict of interest, but rather, a question of contractor integrity and responsibility to properly perform the contract. In this regard, defendant asserts that it has already determined that Harris has the integrity to perform the sole-source contract, the COSSI agreement, and the ACSN.

The Federal Acquisition Regulation defines an organizational conflict of interest as:

> [B]ecause of other activities or relationships with other persons, a person is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage.

48 C.F.R. § 9.501(b) (1994). The FAR further provides that:

> (b) [O]rganizational conflicts of interest are more likely to occur in contracts involving—
>
> (1) Management support services;
>
> (2) Consultant or other professional services;
>
> (3) Contractor performance of or assistance in technical evaluations; or
>
> (4) Systems engineering and technical direction work performed by a contractor that does not have overall contractual responsibility for development or production.

---

**36.** Tr. at 58–59 (citing A.R. at 728).

**37.** *Id.* at 38. Moreover, defendant's internal procedures require that, in the event the amount of contract award exceeds the estimated amount, a new J & A must be prepared and approved in accordance with CICA. Defendant's Motion for Summary Judgment on the Basis of the Administrative Record, Ex. A.

(c) An organizational conflict of interest may result when factors create an actual or potential conflict of interest on an instant contract, or when the nature of the work to be performed on the instant contract creates an actual or potential conflict of interest on a future acquisition.

48 C.F.R. § 9.502 (1994).

The court is mindful of the presumption that contracting officials act in good faith in executing their procurement functions. *See Aero*, 38 Fed.Cl. at 413. Plaintiff has not proffered any evidence, apart from mere speculation on its part, that would suggest defendant erroneously determined the integrity of Harris to perform the instant contract. Accordingly, defendant was not required to obtain an organizational conflict of interest waiver.

### Conclusion

For the above stated reasons, the court determines that defendant adequately explained its justification for awarding the sole-source contract to Harris.[38] Thus, plaintiff's motion for summary judgment is denied. Further, defendant's and Harris' motions for summary judgment upon the administrative record are granted. Accordingly, the Clerk is directed to dismiss plaintiff's complaint. No costs.

---

**38.** Because the court determines the J & A adequately explains the reasons for awarding the sole-source contract to Harris, the court does not address plaintiff's argument that the J & A erroneously relied upon 10 U.S.C. § 2304(c)(5), the "expressly authorized by statute exception" to less than full competition in justifying award to Harris.