**DWS, INC., Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**Nos. 18–87 C, 317–87 C.**

United States Claims Court.

Oct. 24, 1989.

20. The court will entertain a proper application for attorney fees and expenses on motion by plaintiff. *See* RUSCC 81(e).

**454**

Michael J. Ladino, Washington, D.C., for plaintiff.

J. Keith Burt, Washington, D.C., with whom was Stuart Schiffer, Acting Asst. Atty. Gen., for defendant.

## OPINION

RADER, Judge.

On October 1, 1985, DWS, Inc. (DWS or plaintiff), entered into a one-year contract with the United States Army. Under this contract, DWS agreed to train helicopter pilots at the Army Aviation Center in Fort Rucker, Alabama. The contract required DWS to provide instruction pilots, command pilots, and administrative personnel. After several months of performance, DWS stopped all contract work. The next day the contracting officer terminated plaintiff's contract for default.

Plaintiff challenged the termination for default before the Armed Services Board of Contract Appeals (ASBCA or Board). Following a five-day trial, the ASBCA upheld the default termination on June 17, 1987. Plaintiff appealed the ASBCA decision to the United States Court of Appeals for the Federal Circuit. *DWS, Inc. v. United States*, Appeal No. 87–1589. On March 17, 1988, the Federal Circuit dismissed the case for failure to prosecute.

After beginning proceedings before the ASBCA, plaintiff filed Claim No. 18–87C with the United States Claims Court for $3,232,783.00 on January 14, 1987. Additionally, DWS filed Claim No. 317–87C for $1,467,950.00 on June 3, 1987. The Claims Court consolidated these cases on October 1, 1987.

On September 22, 1987 plaintiff filed a motion for summary judgment in the present action. Defendant responded by filing a cross-motion for summary judgment. Subsequently, plaintiff withdrew its motion for summary judgment on January 19, 1989.

Counsel for plaintiff first entered his appearance on February 13, 1989. By this date plaintiff's former counsel had completed all briefing in opposition to Defendant's Motion for Summary Judgment. On February 15, 1989, the court granted plaintiff leave to file a brief supplementing the briefs filed by plaintiff's former counsel.

On February 18, 1989, this court dismissed without prejudice three of plaintiff's claims for lack of jurisdiction. Two of these claims lacked proper certification under the Contract Disputes Act of 1978, 41 U.S.C. § 605(c)(1). Plaintiff had not submitted the third, DWS's claim for lost profits, to the contracting officer for a decision.

Two claims remain at issue. The Army's contracting officer denied plaintiff's certified claim in the amount of $545,647.00 on August 11, 1986 and a second certified claim for $1,128,230.00 on December 16, 1986.

Defendant contends that the ASBCA previously litigated all facts necessary to resolve the pending claims. Based on that litigation, defendant argues that the doctrine of collateral estoppel bars plaintiff from relitigating the same issue in the Claims Court.

Plaintiff contends that the ASBCA only considered the propriety of the termination for default. Plaintiff did not raise the issue of Government negligence before the ASBCA. Therefore, plaintiff argues that the ASBCA decision did not deal with the substance of the claims before this court.

After briefing and argument, this court grants defendant's summary judgment motion. This court finds that Board previously litigated the facts necessary to determine plaintiff's claims.

## FACTS

In 1985, the Department of the Army (Army) awarded DWS[1] a contract[2] to train helicopter pilots. Under this contract, plaintiff received a fee for each student entering the program.[3] The pilot training took place in five phases at the Army Aviation Center at Fort Rucker, Alabama. The one-year contract began October 1, 1985. Plaintiff abandoned the contract on July 14, 1986 and ceased performance the next day. As a result, the contracting officer terminated the contract for default on July 15, 1986.

The Army's original solicitation included a flow chart which projected student enrollment in the flight training course. Plaintiff used information from this chart to determine the amount of its bid. The chart featured Government historical data. The Army used identical information in solicitation of other flight training contracts.

The flow chart showed that 7½% attrition would likely occur as students flunked out of early training exercises. *DWS, Inc.,* 87-3, BCA at 101,041-43. The chart projected an additional 5% attrition to occur later during advanced training. Thus, the chart suggested that plaintiff would need fewer flight instructors as training progressed.

The flow chart influenced plaintiff's bid. However, DWS knew, prior to placing its bid, that the actual attrition rate on other training contracts had been 2%—3%, much lower than the flow chart's projections. *Id.* Plaintiff learned the actual attrition rate from written questions and answers to pre-bid inquiries provided to each prospective contractor.[4] The actual attrition rate during the DWS contract was less than 2%.

The contract contained lengthy specifications for each phase of training. The contract syllabus detailed the number of training hours each pilot must complete. It also

1. The Board determined:
     DWS is a small business service contractor. This was its first contract for flight services. The basic year contract price was almost five times larger than the company's prior year total sales.
   *DWS, Inc.,* ASBCA 33,245, 87-3 BCA ¶ 19,960 at 101,039 (1987) (citation omitted).

2. The fixed price for the contract was $17,962,-313.00 for the period October 1, 1985 to September 30, 1986. *DWS, Inc.,* 87-3, BCA at 101,039. Contract line item numbers (CLIN) provided for adjustments in the contract price with 30 day advance notice for increases or decreases in student input. Specific fees were evaluated for most CLINs. *DWS, Inc.,* 87-3, BCA at 101,039. "DWS was the highest bidder on six of the eight CLINs that were not evaluated, exceeding the next highest bidder in four instances by over 100% (exh. G-17)." *Id.* at 101,040.

3. The method of payment was based on the number of students entering the program rather than those completing the course of instruction. The contract required plaintiff to train students to a certain level of proficiency. Thus, the Board found:
     The contract called for increases and decreases in the fixed price of the contract in the event of changes to the student input. Student output was not referred to in the contract in terms of payment (tr. 4/9-10).
   *DWS, Inc.,* 87-3, BCA at 101,040.

4. The answers to pre-bid inquiries included the following:

QUES: PAGE 94 OF 156, PRIMARY FLOW CHART, INDICATES AN AVERAGE ATTRITION RATE OF 9.74% FOR CLASSES 85½ THROUGH 86³⁷/₃₈ WHEREAS THE ACTUAL ATTRITION FOR ALL FY 85 PRIMARY CLASSES COMPLETED THUS FAR IS 2.77%. A PROGRAMMED ATTRITION GREATER THAN THE ACTUAL ATTRITION SERVES ONLY TO CREATE A REQUIREMENT FOR MORE FLIGHT INSTRUCTORS THAN THE FLOW CHARTS INDICATE ARE NECESSARY, THUS THE CONTRACTOR IS LEFT WITH AN INSUFFICIENT NUMBER OF INSTRUCTORS. HAS ANY THOUGH [SIC] BEEN GIVEN TO REFLECTING THE TRUE ATTRITION RATE IN THE FLOW CHARTS, THEREBY ELIMINATING THE PROBLEM? ANS: THE 9.74% ATTRITION RATE IS THE ANTICIPATED PERCENTAGE OF STUDENTS WHO WILL NOT GRADUATE WITH THEIR CLASS. THE RATE IS COMPRISED OF STUDENTS WHO MAY BE SET-BACK TO ANOTHER CLASS AND WILL GRADUATE AT A LATER DATE AND STUDENTS WHO ARE ELIMINATED PERMANENTLY FROM THE COURSE.
*DWS,* 87-3, BCA at 101,042. The Board concluded that *DWS* had used these questions and answers in preparing its bid. The Board found:
     These questions and answers were carefully examined by DWS prior to bidding (tr. 5/57). DWS recognized when it bid that the student numbers on the charts were estimates or projections and could be adjusted....
*Id.*

designated Government standards that each pilot must accomplish. Prior to advancing to the next phase, student pilots had to master flight skills at earlier levels.

The contract specified five consecutive training phases: (1) Indoctrination; (2) Primary; (3) Contact; (4) Advanced Instruction; and (5) Tactical. Plaintiff undertook to train students in the primary (2) and advanced (4) phases. Military personnel conducted training in other phases. The contract established a specific number of DWS support staff. Contract specifications for primary and advanced flight training required a ratio of one instructor per two students.

The Army agreed to pay plaintiff Method of Instruction (MOI) costs to train additional flight instructors when student enrollment increased. The contract required thirty days advance notice prior to an increase or decrease in student enrollment. This notice allowed the contractor to add or delete flight instructor personnel.

Students who did not pass the eight-week primary training had to repeat the training. These repeating students remained in the class until they mastered the skills or flunked out. The contract specifically stated that the Army would pay no additional fees for repeating students.[5] Historical records for the five preceding years indicated that an average of 4% of primary students and 12% of advanced students repeated those phases. *DWS, Inc.,*. 87–3, BCA at 101,041. One and one-half percent of primary students and 15½% of advanced students on plaintiff's contract actually repeated those phases of training. Plaintiff's Motion for Summary Judgment, filed Sept. 22, 1987, Appendix at 161–62.

After plaintiff commenced performance, the United States Congress—operating under the Gramm–Rudman–Hollings Act [6]—reduced the availability of funds. The reduction affected this pilot training program. The Army cut back student enrollment significantly during May and June 1986. Specific contract line items permitted those reductions. The contract price was reduced by $1,459,558.00 (8%) through completion of the contract. Prior to May and June, more students than anticipated had enrolled.

On January 9, 1986, the contracting officer met with plaintiff. Plaintiff requested additional payment because more students remained in the program than the flow chart projected. The contracting officer informed plaintiff by letter on January 10, 1986, that payment depended upon input of students into flight training, not output. Prior to meeting with plaintiff, the contracting officer was not aware of a dispute in interpreting the contract's payment provisions.

On May 24, 1986, plaintiff filed a revised claim for $545,647.00 with the contracting officer for the period of October 1, 1985 to April 4, 1986. Plaintiff claimed that the flow chart projections misrepresented the number of graduating students and, in turn, the number of instructors required for the primary and advanced classes. The contracting officer denied that claim on August 11, 1986. However, the contracting officer determined that the Army owed plaintiff $54,349.60 for training of repeating students carried over from the previous contractor.

Plaintiff filed an additional claim on July 9, 1986 for $1,128,230.00. It covered the period October 1, 1985 through June 30, 1986 and duplicated some items from the May 24, 1986 claim. The contracting officer denied this claim on December 16, 1986.

---

**5.** The Contract, § C–5 provides:
Specific Tasks 5.1.1 *The contractor* shall be responsible for providing the requisite training for students until they attain the standards of proficiency acceptable to the Government or until eliminated from the program. In some instances students may require more than scheduled syllabus time prior to their completion or elimination from the program. The contractor will provide the additional training required for these students, without change to the contract price.
*DWS,* 87–3, BCA at 101,040–41.

**6.** On December 12, 1985, the President signed into law the Balanced Budget and Emergency Deficit Control Act of 1985, Pub.L. 99–177, 99 Stat. 1037, codified at 2 U.S.C. §§ 901–22 (Supp. IV 1986). The Act is popularly known as Gramm–Rudman–Hollings.

On July 14, 1986, plaintiff notified the contracting officer of its intention to abandon the contract if claims were not paid. The Army informed plaintiff by letter on July 15 that a default termination would take effect July 16, 1986.

Plaintiff contends that the Army's flow chart estimates were erroneous, negligently prepared, and based on false historical data. Plaintiff seeks relief because the Army changed its demands on plaintiff by requiring training of more students than projected. Further, plaintiff contends that the dispute arose out of different interpretations of the contract's payment clause.

Defendant contends that the ASBCA has already heard the same factual situations raised in plaintiff's complaint. Defendant argues that the doctrine of collateral estoppel bars plaintiff from relitigating these issues. This court must decide whether prior litigation before the ASBCA bars plaintiff's present claims.

## DISCUSSION

### Summary Judgment

Originally, both parties moved for summary judgment. Later, plaintiff withdrew its motion and requested dismissal of some claims. This court granted plaintiff's motion. Defendant's summary judgment motion remains pending.

Neither party has identified material facts that remain in dispute. Thus, summary judgment is appropriate to decide the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In the absence of disputed facts, this court must decide whether the moving party is entitled to judgment as a matter of law. RUSCC 56; *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988).

### Collateral Estoppel

In moving for summary judgment, defendant invokes the doctrine of collateral estoppel. When a tribunal with proper jurisdiction litigates and decides an issue, that decision binds the losing party in subsequent litigation. *Mother's Restaurant,*

*Inc. v. Mama's Pizza, Inc.,* 723 F.2d 1566, 1569 (Fed.Cir.1983).

Defendant asserts that plaintiff's claim arises out of the same set of operative facts already litigated and decided by the ASBCA. Plaintiff appealed the contracting officer's default termination to the ASBCA on July 18, 1986. On August 1, 1986, plaintiff requested that the ASBCA dismiss its appeal No. 33026, without prejudice, in order that it might appeal directly to the Claims Court. The Board denied the request on August 28, 1986 because plaintiff, with full knowledge of alternative appeal rights, elected to appeal to the ASBCA. The Board held that this election bound plaintiff. *DWS, Inc.,* ASBCA 33,026, 87–1 BCA, ¶ 19,348 (1986). After a full hearing, the ASBCA denied plaintiff's claims. The Board found that the Army properly terminated the contract for default. The Board also found no material breach or failure by the Army to make required payments under the contract. *DWS, Inc.,* 87–3, BCA at 101,049–50.

During the hearing, the ASBCA made factual determinations directly deciding the propriety of other decisions by the contracting officer. The Board asked plaintiff whether it had appealed other final decisions. Plaintiff's counsel replied that it had not and stated:

> We were concerned, to be honest with you, Your honor, that the expedited hearing that you were kind enough to grant us here would be prejudiced if we had filed appeals for all of these claims.
>
> . . . .
>
> But this hearing is so critical and so vital to DWS that we elected not to confuse it or compound it by filing or by appealing those claims and combining the jurisdiction of this court.

At that point, the following exchange took place:

> Judge Stempler: Okay. I'd like to advise you both it's become apparent to me, as it must be apparent to you, that while this appeal only involves a termination for default, it's going to be unavoidable that we determine some facts that impact at least partially and maybe sub-

stantially on the claims. We're not litigating the claims, but I cannot see at least at this point—and again, I'm not as familiar with the case as you gentlemen—I cannot envision that we won't decide at least some facts that will impact on the claims.

[Plaintiff's Counsel]: I endeavor to—

Judge Stempler: And there will be collateral estoppel, I assume.

[Plaintiff's Counsel]: I endeavored to alert you, Your Honor, in my opening statement of that fact.

Defendant's Brief, filed Nov. 10, 1987, Appendix at 30–31. Plaintiff, with this clear notice, elected to proceed before the Board with the default termination action.[7] Plaintiff elected to proceed with full knowledge that facts would be determined during the hearings which would decide some claims by application of collateral estoppel. The Board then issued a ruling adverse to plaintiff.

In its motion for reconsideration to the ASBCA, plaintiff complained that the ruling could preclude it from litigating some claims before this court. Therefore, plaintiff requested:

[W]e should "defer" our decision until the Claims Court decides whether to concur in portions of our decision and until the Claims Court liquidates the quantum portions of the claims.

*DWS, Inc.,* ASBCA 33,245, 87–3, BCA ¶ 20,133 at 101,924–25 (1987) (footnote omitted).

In denying the motion the Board stated:

It appears that appellant's complaint is that it may be collaterally estopped to some extent in the Claims Court proceedings. This indeed may be the case. Appellant was aware of this possibility but decided to press for an accelerated disposition of this appeal (tr. 1/25–26, 2/178–80, 2/180–81). The extent to which appellant will be collaterally estopped in its

Claims Court litigation will be decided by that tribunal.

*DWS, Inc.,* 87–3, BCA at 101,925.

The Federal Circuit has explained the doctrine of collateral estoppel:

Under the doctrine of issue preclusion, traditionally called "collateral estoppel," issues which are actually and necessarily determined by a court of competent jurisdiction are conclusive in a subsequent suit involving the parties to the prior litigation.... The underlying rationale is that a party who has litigated an issue and lost should be bound by that decision and cannot demand that the issue be decided over again.

*Mother's Restaurant,* 723 F.2d at 1569 (citation omitted). The Federal Circuit clearly articulated the requirements for the application of the doctrine:

(1) [T]he issues to be concluded are identical to those involved in the prior action; (2) in that action the issues were raised and "actually litigated"; (3) the determination of those issues in the prior action was necessary and essential to the resulting judgment; and (4) the party precluded ... was fully represented in the prior action.

*Mother's Restaurant,* 723 F.2d at 1569 (footnote omitted).

Plaintiff contests application of the doctrine of collateral estoppel. Plaintiff argues that the ASBCA addressed only the default termination. According to plaintiff, the ASBCA did not address the issue of Army negligence in preparation of the flow charts.

### Identity of Issues

In applying the first element of the test for collateral estoppel, this court must compare the issue before it with the issue already litigated. When deciding the propriety of the default termination, the Board also decided the facts necessary for resolution of this case.

7. At oral argument plaintiff contended that ASBCA deliberations on the attrition were not complete when the termination for default was upheld. Transcript of Proceedings, Case No. 18–87C/317–87C, filed Sept. 7, 1989, at 56. The timing of these Board decisions does not change the fact that plaintiff knew of the possible consequences and elected to continue the termination for default proceeding. Plaintiff's election was binding.

Upon a review of the record, the ASBCA found no Army negligence in preparation of the flow charts. Although plaintiff did not introduce the issue of negligence in those terms, the Board nevertheless decided that the Army was not negligent. This finding was an essential element for resolution of the default decision.

Plaintiff argues in this court that the Army's estimates of student enrollment in flight training were erroneous and negligently prepared. Before the Board, plaintiff also claimed the flow charts caused the problem. The Board stated:

> [T]he attrition rate it allege[d] was promised to it by the representations made in the flow charts never materialized in full. Thus, during the last half of any one class, it was training more students than it anticipated and consequently incurring more IP [instruction pilot] expense. It is difficult to envision a clearer case of a contractor claim. The contract was being paid out fully and completely; appellant was aggrieved because its costs were higher than it anticipated due to an alleged failure to achieve anticipated attrition.

*DWS, Inc.,* 87–3, BCA at 101,051.[8]

To determine the propriety of the default determination, the Board necessarily found that the Army had not been negligent:

> There is no allegation that these estimates were negligently prepared and we find that they were not. The input number does not necessarily represent the total number of students in a class. Students that have been set-back from another class are not counted as input into their second class, for they were already counted as input once when they first began the course (tr. 1/45–46, 49, 71, 2/201–05, 209, 214, 3/622–63, 87–88).

*DWS, Inc.,* 87–3, BCA at 101,045. The Board specifically ruled that the figures on the flow chart were estimates. Moreover, plaintiff knew that the actual number of enrolled students had in the past and could in the future vary from these projections. These findings and rulings preclude relitigation.

Upon reconsidering its decision, the Board further stated:

> As we indicated in our original decision, it does not surprise us that a multi-million dollar reprocurement contract, entered into on short notice would contain terms and conditions different than appellant's. We can find no bad faith in the Government's conduct. Appellant's complaint seems to be that the reprocurement contractor would not accept the same bargain as appellant struck.

*DWS, Inc.,* 87–3, BCA at 101,926. The Board earlier had found that the contract based payment upon the number of entering students. Plaintiff based its bid on an estimated number of entering students that differed from the actual number of entrants. The Board concluded that plaintiff knew actual numbers could vary from the estimates and that the contract was fully paid. These fact determinations are cornerstones of the ASBCA's ruling.

Plaintiff's argument that the ASBCA ultimately decided a different issue is inapposite. The ASBCA upheld the default termination and in doing so made factual conclusions which prevent DWS from relitigating the negligence issue. Thus the issue before this court is identical to one of the issues determined by the ASBCA.

Admittedly the issue raised in this case was only a subset of the issues in the ASBCA case. Rather than seeking relitigation of established facts, plaintiff attempts now to raise new legal arguments. The ASBCA, however, necessarily decided the negligence case in reaching its decision. Therefore, the prior litigation before the

---

**8.** An explanation of the meaning of this sentence was given by the Board when denying DWS's motion for reconsideration. "We were determining whether there was a breach of the payment provisions or whether DWS was pursuing a claim." *DWS, Inc.,* 87–3, BCA ¶ 20,133 at 101,925 (1987). Plaintiff included this sentence in its brief in support of a motion for reconsideration. DWS indicated that sentence meant that the ASBCA had "judicially confirmed" its claims. The Board, in its opinion, denied that inference. "( [I]t appears from appellant's brief that 'judicially confirmed' means we decided the claims in appellant's favor).... Appellant has taken the sentence totally and completely out of context." *DWS, Inc.,* 87–3, BCA at 101,925.

Board satisfies the identity of issues requirement for application of collateral estoppel. Moreover, plaintiff, having failed to make all its arguments before the Board, cannot now advance a new legal contention.

For another reason, plaintiff's argument does not persuade this court. The United States Claims Court has stated:

Although plaintiff is *correct* that it is *not seeking* to relitigate the identical claim in the instant case that it litigated before the Board, this fact does not save plaintiff's position. While not litigating the same claim, plaintiff seeks to litigate the same underlying facts. Under established principles of issue preclusion, plaintiff is barred from doing this.

*Neal & Co., Inc. v. United States*, 13 Cl.Ct. 282, 287 (1987); *see also, Jackson Jordan, Inc. v. Plasser Am. Corp.*, 747 F.2d 1567, 1575–76 (Fed.Cir.1984). The doctrine of issue preclusion operates to prevent such duplicative litigation.

### *Actually Litigated*

The second step in collateral estoppel analysis examines whether the prior court "actually litigated" the precludable issue. The Federal Circuit explained that the parties to " 'the original action [must have] disputed the issue, and the trier of fact [must have] resolved it.' " *Mother's Restaurant*, 723 F.2d at 1570.

The ASBCA heard and resolved the issue of Army negligence in preparation of the flow charts. For instance, the ASBCA weighed the preparation of these flow charts:

The input number for the charts is taken from Army Training and Resources Requirement System and reflects the number of students that the Army anticipates that it will train in any particular course during a given period.... The attrition figures are estimates gathered from historical data and this fact was revealed to appellant prior to bidding.

*DWS, Inc.*, 87–3, BCA at 101,045. The Board also noted that pre-bid questions and answers provided the actual attrition rate to plaintiff. In fact, the Board determined that written correspondence between plaintiff's president and vice president before the bidding shows a knowledge that flow chart figures were not set in stone.[9]

The Board concluded that plaintiff's negligence in bidding, not the Army's negligence, caused plaintiff's losses. During the Board hearing, plaintiff's president presented a financial exhibit that showed a profit margin of $1,694,662.00 should the Army pay the claim for additional work. "In actuality, as discovered by the Government's auditor at trial, AR4, tab 3C had mathematical errors in it...." *DWS, Inc.*, 87–3, BCA at 101,043. The actual figures

---

**9.** The Board determined:

Prior to bidding, in reviewing DWS' proposed bid, Mr. Dana Dennison (appellant's president) and Mr. Wally Wallace (appellant's vice-president) had a written exchange of questions/comments and answers between themselves (tr. 5/52, 138), relevant ones of which are set forth below:

1. By Mr. Dennison: "I have studied the flow charts until I'm blind and it seems to me we must have a minimum of 348 pilots to meet the SOW. How do you propose to do it with 333?"

By Mr. Wallace: "Flow Charts is it! There isn't any workload data anywhere else. Figuring out the hash marks, the ave. stu. residence, etc. does come out to 348 as I see it too. I figure that they will come up short in some starting classes but won't know 30 days prior and that some attrition will occur outside primary and advanced (where they show 7.5% and 5% + respectively)—maybe less

than 5–8% but still *some*. I figure that some IP's will show up absent with notice or some unusual occurrence will let us use flt. cdrs. *some*—All those things I estimate will save 20 IPs per year on average. On the other hand we'll need some *additional* IPs for added training reqrd.—I guessed 5 man years for this."

2. By Mr. Dennison: "Also what impact do you feel the 4% & 12% of student requiring extra help will impact—does that mean 4% more students?"

By Mr. Wallace: "See last part of # 1 above. The 4 + 12% 'slow learners' in primary and advance does *NOT* mean they repeat the whole course. They might need 1 extra hour or maybe 2 extra weeks—That more likely translates to less than 1% additional IP effort. That's how I arrived at 5 more IPs on average 5/350 = 1% +."

*DWS, Inc.*, 87–3, BCA at 101,042–43 (footnote omitted).

show $225,725.00 or 1.27% profit if the claims were paid.

This bid award was DWS's first contract for flight services. During the ASBCA hearing, plaintiff's accountant testified that DWS intended to rely solely upon the $625,-000.00 phase-in payment, the contract payments, and its line of credit. Plaintiff had built no flexibility into its thin profit margin. According to plaintiff's testimony it lost $5,200.00 per month each time two students dropped out of the program, but saved only $3,000.00 per month in reduced costs. *DWS, Inc.*, 87–3, BCA at 101,043. Plaintiff's negligence in bidding, not the Army's negligence, caused plaintiff's losses.

### Necessity of ASBCA Determination

Before deciding whether the Army properly terminated plaintiff's contract for default, the Board necessarily decided whether the Army negligently prepared the flow chart or otherwise caused plaintiff to perform work beyond contract requirements. Plaintiff argued that the flow charts caused it to bid too low. If the Army was responsible for preparing these flow charts erroneously, the Board would have concluded that the Army was, at least, partially at fault for plaintiff's failure to perform the contract. The Board would have held that the Army contributed to the problem which led to contract termination. To the contrary, the Board ruled that the Army was not at fault and had properly terminated the contract for default.

The Board, therefore, necessarily addressed the issue of whether the Army contributed to the default by negligent preparation of the flow charts. The Board concluded:

> [W]e find that [these estimates] were not [negligently prepared]. The input number does not necessarily represent the total number of students in a class.

*DWS, Inc.*, 87–3, BCA at 101,045. This finding was necessary to establish that the Army had not been, in part, at fault for causing termination of the contract.

### Full Representation in Prior Action

The final requirement for issue preclusion, full representation of the parties in the prior action, is not in dispute. Both defendant and DWS were parties in the prior litigation. Both were represented by counsel and enjoyed full representation within the meaning of the collateral estoppel doctrine.

### CONCLUSION

Defendant's showing satisfies the doctrine of collateral estoppel. Defendant has shown that the ASBCA decided the critical issue of Army negligence. Accordingly, the rule applies:

> [O]nce an issue of fact or law is actually and necessarily determined by a court of competent jurisdiction, that decision is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation.

*Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *see also, International Order of Jobs Daughters v. Lindeburg & Co.*, 727 F.2d 1087, 1090 (Fed.Cir.1984). Thus, plaintiff, after being fully informed of alternative appeal rights, elected to appeal to the ASBCA and is bound by the ASBCA decision.

This court grants defendant's summary judgment motion and directs the Clerk to enter judgment dismissing plaintiff's complaints.

No costs.