540

IMPRESA CONSTRUZIONI GEOM.
DOMENICO GARUFI,
Plaintiff,

v.

The UNITED STATES, Defendant.

No. 99–400C.

United States Court of Federal Claims.

Aug. 12, 1999.[1]

---

1. This opinion was issued under seal on July 30, 1999. Pursuant to ¶ 2 of the ordering language, the parties were instructed to identify protected/privileged material subject to deletion. Brackets identify the material deleted or substituted to remove protected/privileged information. At the government's request, the caption to the opinion has been amended to add the names of Department of the Navy counsel.

Sam Zalman Gdanski, Suffern, New York, for Plaintiff. Jeffrey Gdanski and Scott Gdanski, Suffern, New York, of counsel.

Franklin E. White, Jr., with whom were David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, and Mark A. Melnick, Assistant Director, Department of Justice, Washington, DC, For Defendant. Vicki E. O'Keefe and Robert E. Little, Department of the Navy, of counsel.

## OPINION

HEWITT, Judge.

This matter comes before the court on a post-award bid protest. Impresa Construzioni Geom. Domenico Garufi ("Garufi" or "plaintiff") challenges the decision of the Navy (the "Navy" or "government") to award a consolidated services contract under Solicitation N33191–98–R–1807 (the "Solicitation") for a variety of services including the government improperly evaluated its pricing data and technical proposal as well as the technical proposal of the successful awardee,[2] lead-

---

**2.** The successful awardee, Joint Venture Conserv, is not a party to this litigation.

ing to Garufi's improper elimination from the competitive range. Garufi also contends that the government failed to determine properly the responsibility of the successful awardee.

## I. Background

On August 28, 1998, the Navy issued a Request for Proposals ("RFP") for a combination Firm–Fixed Price and Indefinite Quantity contract for services to be performed on the U.S. Naval Air Station in Sigonella, Italy (the "contract"). Administrative Record ("AR") at 2. One of the purposes of the RFP was to combine several existing service contracts on the naval base in an effort to "reduce the administrative effort in managing several separate contracts." *Id.* at 1056. The RFP sought proposals for a base period and four one-year options. *Id.* at 3–141. The RFP estimated the total cost of the contract to be $26,356,-101. *Id.* at 1056. The government intended to evaluate the proposals and award the contract without discussions with the offerors, but reserved the right to conduct discussions if deemed necessary by the Contracting officer. *Id.* at 1057.

The RFP required offerors to submit proposals by October 5, 1998. *Id.* at 774. Three amendments were issued prior to October 5, 1998. A fourth amendment was issued after the proposals were received. *Id.* at 774–778, 2041. Four offerors responded to the solicitation: Impresa–Construzioni Geom. Domenico Garufi ("Garufi"), Joint Venture Conserv ("JVC"), [Offeror 3] and [Offeror 4]. *Id.* at 1613.

### A. Factors for Evaluation

The RFP stated that the contract would be awarded to the offeror who submitted the proposal that represented the best value to the government, with consideration of the following evaluation factors: "price reasonableness," "organizational past performance," and "capability." *Id.* at 381. Offerors were advised that organizational past performance and capability were of equal importance to each other, and combined with each other were as important as price. *Id.*

The RFP required offerors to submit separate technical and price/cost proposals and a list of references for past performance evaluation. *Id.* at 375–76. The technical proposals were required to be "precise, detailed, and complete as to clearly and fully demonstrate a thorough knowledge and understanding of the requirements." *Id.* at 376. The four relevant factors to the technical proposal were: (1) Corporate Capability, (2) Management, (3) Quality Control and (4) Corporate Financial Resources. *Id.* at 378–79. The technical proposals were required to provide specific information relevant to each subfactor. *Id.* The price proposals were required to include a breakdown of costs of various items including overhead, materials, labor, and administration. *Id.* at 377. The RFP noted that the price proposal must show evidence of realism of costs to demonstrate that the offeror is capable of projecting reasonable costs and possesses an understanding of the nature and scope of the work to be performed. *Id.* at 379–80.

Two separate boards were established to evaluate the technical and price proposals. The Technical Evaluation Board ("TEB") was comprised of Ms. Barbara Neuhauser, Chairman, Lt. Matt Suess, Member and Mr. Giovanni Schiavo, Member. *Id.* at 1060. The TEB was required to:

(1) Conduct a technical assessment of each offeror's capability to successfully perform the prospective contract based solely on the evaluation factors and subfactors specified in the solicitation.

(2) Prepare a consensus summary report documenting the relative strengths, deficiencies, significant weaknesses, and risks to support the evaluation of each proposal (w/suggested questions/concerns and/or comments)

(3) Brief the Contracting Officer and/or SSB on the evaluation.

(4) Provide assistance in conducting exchanges

(5) Evaluate revisions resulting from exchanges and prepare subsequent report.

*Id.* at 1060. Proposals were to be rated as "Superior," "Highly Acceptable," "Acceptable," "Marginal," or "Unacceptable" as set forth in the solicitation. *Id.* at 1077.

The Price Evaluation Board ("PEB") was comprised of Ms. Nancy Trent, Chairperson and Ms. Mariella Falbo, Member. *Id.* at 1061. The PEB was required to (as requested):

(1) Develop the solicitation price schedule (to be completed by offerors)

(2) Receive all price portions of the proposals and maintain confidentiality of all pricing information

(3) Conduct* price analyses of proposals to determine price reasonableness

(4) Prepare a consensus summary report documenting the price analyses and include any concerns and/or suggested questions/comments to be addressed to offerors.

(5) Brief the SSB

(6) Provide assistance in conducting exchanges with offerors

(7) Evaluate proposal revisions and prepare subsequent report

*The Government may use price analysis techniques and procedures to ensure a fair and reasonable price. . . .

*Id.* at 1061.

The TEB and the PEB evaluated the relevant proposals under the specified criteria and drafted reports to advise the Source Selection Board ("SSB"). *Id.* at 1059. The SSB was comprised initially of Ms. Trent as the Contracting Officer and Chair, Ms. Neuhauser, Member and Mr. Chris Biglin, Advisor. *Id.* at 1059. Some time between August 21, 1998 and December 10, 1998, Mr. David Sellman replaced Ms. Trent as Contracting Officer and as Chair of the SSB and PEB. *Id.* at 1051, 1054, 1061.

## B. Evaluation of Proposals

The TEB made its first report of its evaluation of proposals on January 14, 1999. *Id.* at 1613. This report summarizes the evaluation of each proposal pursuant to the four factors set forth in the solicitation and provides the rationale for each rating given to each proposal for each of the factors.[3] *Id.*

3. The four technical factors were Corporate Capability, Management, Quality Control, and Corporate Financial Resources. AR at 378–379.

[Offeror 4] received a rating of "Unacceptable" for all four factors and overall. *Id.* Garufi received a rating of "Marginal" for all four factors and overall. *Id.* [Offeror 3] received a rating of "Marginal" for all four factors and overall. *Id.* JVC received a rating of "Acceptable" for the first factor and "Marginal" for the rest of the factors and overall. *Id.* The TEB recommended that [Offeror 4] be excluded from the competitive range because its proposal had "no reasonable chance of becoming acceptable without a complete rewrite." *Id.* at 1617. The TEB recommended that Garufi, [Offeror 3], and JVC be included in the competitive range "as their proposals all have a reasonable chance of becoming at least acceptable, if given the opportunity for discussions." *Id.* The TEB's report highlighted the weaknesses and deficiencies in the three remaining proposals that necessitated discussions and clarifications with the remaining offerors. *Id.* at 1613, 1617. However, the precise details are not material to this opinion because Garufi does not appear to dispute the appropriateness of this first TEB report. What is clear is that Garufi, [Offeror 3] and JVC were recommended to be included in the competitive range by the TEB.

The PEB's first report on its evaluation of proposals is dated January 31, 1999. *Id.*, at 1674. Each of the four offerors' proposed prices for the firm fixed price ("FFP") portion of the contract, the indefinite quantity ("IQ") portion of the contract and the combined total prices of each were presented to the SSB in a chart followed by a Government Estimate ("GE") as follows:

| | FFP | IQ | Total |
|---|---|---|---|
| [Offeror 4] | $ 8,694,317.00 | $ 2,049,878.00 | $10,744,195.00[4] |
| Garufi | $14,695,630.00 | $ 4,260,401.00 | $18,956,081.00 |
| JVC | $17,782,200.00 | $10,886,814.00 | $28,669,014.00 |
| Government Estimate | $21,297,388.00 | $ 5,707,942.00 | $27,005,330.00 |

*Id.* at 1675.

The PEB noted great concern that Garufi was "consistently and excessively below the GE in both the Firm Fixed Price (FFP) and Indefinite Quantity (IQ) portions." *Id.* at 1676. While Garufi's estimate for the FFP

4. We omit a footnote stating that [Offeror 4's] proposed pricing was for janitorial services only.

of the base year was above the GE, the disparity between Garufi's proposed prices was of most concern to the PEB in the option years because "the cost for these services are not expected to decline or remain constant" while Garufi's proposal projected declining costs with each year. *Id.* at 1677. Garufi's proposed total price was an average of 29.8% below the GE. *Id.* at 1676. In contrast, JVC's total proposed price was much more closely aligned with the Government Estimate—on average 6.16% above the GE. *Id.* at 1677. The PEB recommended to the SSB that [Offeror 4] be excluded from the competitive range because the offeror submitted price proposals only on janitorial services. *Id.* at 1678. The PEB found that Garufi, [Offeror 3] and JVC all "have pricing issues which need to be addressed." *Id.* at 1679. The PEB concluded its report by recommending that all three firms "be included in the competitive range and that discussions be held with them to allow them the opportunity to correct their price proposals in order to be considered for award." *Id.*

On January 21, 1999, the SSB (Mr. Sellman, Chair, and Ms. Neuhauser, Member) submitted a memorandum "to recommend to the Source Selection Authority ("SSA") the competitive range of Offerors expected to best meet stated U.S. Navy requirements . . . ." *Id.* at 1682. The SSB's report summarized the reports and recommendations of the TEB and PEB. *Id.* at 1684–93. The SSB recommended that the three offerors recommended by the TEB and PEB "all be included in the competitive range" and that "discussions will be held with the three firms that make up the competitive range." *Id.* at 1694. The SSB also recommended that "[a]n amendment after closing be issued concurrent with discussion letters to all Offerors remaining in the competitive range. This amendment [0004] changes some of the requirements of the solicitation based on input from the customer. It contains no changes due to initial technical/price evaluation of the offers." *Id.* at 1695.

On February 18, 1999, the Contracting officer sent a letter to Garufi titled "Discussions and Clarifications for Request for Proposal N33191–98–R–1807 Consolidated Services for Naval Air Station, Sigonella, Italy." *Id.* at 2044. The letter notified Garufi that its proposal had been reviewed and, because significant "weaknesses and/or deficiencies" in both its technical and price proposals had been identified, discussions were required. *Id.* Enclosed in this letter were questions about Garufi's initial proposal to be discussed at an upcoming briefing and a copy of Amendment 0004. *Id.* at 2045. The letter required a response to the enclosed questions by 2:00 p.m. a week later, February 25, 1999. *Id.* at 2044–45. The response could, at the offeror's option, take the form of a narrative, or replacement pages to the offeror's proposal, or a completely revised proposal. *Id.* The same cover letter was sent to JVC on the same day with a list of questions raised by JVC's initial proposal and containing the same deadline for response. *Id.* at 2048.

The questions for discussion sent to Garufi included two questions regarding Corporate Capabilities, six questions regarding Management, two questions regarding Quality Control, one question regarding Corporate Financial Resources and two questions regarding Price. *Id.* at 2046–47.

On February 22, 1999, Ms. Antonina Castorina, Ms. Neuhauser, and Mr. Sellman met with offeror representatives, Mr. Joseph Interdonato, Mr. Domenico Garufi, and Mr. Vincenzo Garufi to discuss Garufi's proposal and specific questions about its technical proposal and price proposal. *Id.* at 2039–40. On February 25, 1999, Garufi, [Offeror 3] and JVC submitted revised proposals. *Id.* at 2073–2219, 2221–2497.

The three revised technical proposals were reviewed by the TEB. *Id.* at 2499–2560. Garufi's revised technical proposal received an overall rating of "Unacceptable" by the TEB. *Id.* at 2500. The rationale explained by the TEB in its report was that Garufi's responses to questions posed by the SSB evidenced a lack of understanding of the contract's nature and scope and the type of organizational management necessary to ensure the successful performance of the contract. *Id.*

JVC's revised technical proposal received an overall rating of "Highly Acceptable." *Id.*

at 2502. It was the only one of the three offerors in the competitive range to receive that rating. The other two offerors, Garufi and [Offeror 3], received, respectively, Unacceptable and Marginal ratings—at least two steps below the rating received by JVC. *Id.* at 2500–01. The TEB recommended that Garufi and [Offeror 3] be eliminated from the competitive range on the grounds that: (1) Garufi's revised proposal would take an entire re-write to come into compliance and (2) any further discussions with [Offeror 3] would be construed as technical leveling since the same deficiencies existed in its revised proposal. *Id.* at 2501.

The PEB's evaluation of Garufi's revised proposal noted several concerns about Garufi's excessively low price/cost projections for the option years. *Id.* at 2575–76. The PEB noted that Garufi's estimate for the Firm Fixed Price of the base year remained over the government estimate, but the revised proposal did not sufficiently address the PEB's concerns about the proposal's decreasing cost projections for option years. *Id.* As a result, the PEB recommended that the SSB consider its "significant concerns that [Garufi] may either not fully understand the complete solicitation requirements or be placing itself at an increased performance risk" in determining the competitive range. *Id.* at 2577.

The PEB's evaluation of JVC's revised proposal noted that it was the second low Offeror with an overall proposed price within 6.2% of the GE. *Id.* at 2576, 2578. The PEB recommended to the SSB that JVC remain in the competitive range because it was satisfied that JVC's proposed prices were "based on a clear understanding of the solicitation requirements." *Id.* at 2578.

Based on the evaluation of Garufi's revised proposal, the government made a determination to eliminate Garufi from the competitive range.[5] On or before March 3, 1999, Garufi received a letter of notice that it was eliminated from the competitive range. Garufi

responded with a request for a debriefing. *Id.* at 2753.

### C. Contract Award and Subsequent Actions

The government awarded the contract to JVC on March 5, 1999. *Id.* at 2743–46. Plaintiff requested a debriefing which was held the morning of March 5, 1999. *Id.* at 2748–2754. Mr. Interdonato and Mr. Garufi attended the debriefing on behalf of Garufi. Mr. Sellman, Ms. Neuhauser, and Ms. Castorina attended on behalf of the government. *Id.* at 2750. At the debriefing plaintiff was informed that the government "relied solely on the contents of [Garufi's] proposal and revisions for information and evaluated that information based on the contents of Section L and M of the solicitation." *Id.* Also discussed were evaluation of plaintiff's price proposal and each of the subfactors of plaintiff's technical proposal, with "each individual factor explained in depth," according to the government's documentation of the debriefing. *Id.*

Next, Garufi filed several protests with the General Accounting Office ("GAO"). The GAO issued three decisions in response which, taken together, dismissed all of Garufi's complaints. Plaintiff submitted its first bid protest to the GAO on March 10, 1999 protesting "the elimination of its proposal from the competitive range under the RFP, challenging the evaluation of its proposal." *Id.* at 2997. In its May 4, 1999 decision the GAO dismissed most of Garufi's claims as untimely. *Id.* at 2976. In response to a challenge to JVC's responsibility, the GAO noted that "an agency's affirmative determination of a contractor's responsibility will not be reviewed by our Office absent a showing of possible bad faith on the part of procurement officials, or that definitive responsibility criteria in the solicitation may not have been met." *Id.* at 2977. The GAO went on to state that Garufi had not shown any facts indicating the Navy's bad faith or "that this concerns a definitive responsibility criterion." *Id.*

---

5. The solicitation contained information regarding the competitive range in the Source Selection Materials. AR at 1065–1066. "If the contracting officer decides that an offeror's proposal should no longer be included in the competitive range, the proposal shall be eliminated from consideration for award." *Id.* at 1065.

In a May 14, 1999 decision, the GAO dismissed two requests for reconsideration by Garufi as untimely because "supplemental protests presenting new and independent grounds for protest must independently satisfy our timeliness requirements." *Id.* at 2998. Garufi's April 23, 1999 protest challenged JVC's responsibility due to JVC's alleged Mafia ties and alleged intentional misrepresentations on its Certification Regarding Debarment, Suspension, Proposed Debarment, and Other Responsibility Matters. *Id.* at 2998. However, the GAO found that these allegations failed to state a valid basis for protest where Garufi conceded that the CO was "on notice of JVC's allegedly false certification." *Id.* at 2999. The GAO concluded that the contracting officer's acquaintance· with the allegations meant that "JVC's alleged misrepresentation did not materially or adversely affect the contracting officer's affirmative determination of responsibility." *Id.* Nor did the GAO find that Garufi had asserted facts demonstrating that the contracting officer acted in bad faith. *Id.*

The GAO issued its final decision on June 17, 1999 denying Garufi's protest of the evaluation of its technical proposal as "unacceptable" overall and its resulting elimination from the competitive range. *Id.* at 3048. The GAO reviewed the agency's evaluation of Garufi and found it to be "thoughtful and detailed, and took into consideration all aspects of Garufi's proposal and discussion respons-

es." *Id.* at 3056. The GAO went on to find that

> the agency reasonably concluded that the protester's initial proposal and responses to discussion questions lacked sufficient clarity regarding its capability to manage a relatively large maintenance contract, its management structure, and the availability of top level personnel, and that this lack of clarity, considered in conjunction with a price that was 25 percent lower than the government estimate, indicated a lack of understanding of the contract's requirements.

*Id.*

On June 28, 1999, plaintiff filed its Complaint and Motion for a Temporary Restraining Order ("Motion for TRO") in the Court of Federal Claims.[6] Plaintiff seeks to have the court "direct the agency to properly evaluate both Garufi [and] JVC, in accordance with the RFP and FAR, and either reopen discussions with Garufi, or properly evaluate the offerors or make award of the solicitation to Garufi." Plaintiff's Complaint, filed June 28, 1999 ("Complaint") at ¶ 129.

Defendant filed its Cross–Motion for Judgment on the Administrative Record and Opposition to Plaintiff's Motion for Summary Judgment on July 18, 1999. Plaintiff filed its Reply to the Defendant's Cross–Motion for Judgement upon the Administrative Record and Opposition to Plaintiff's Motion for Sum-

---

6. Defendant voluntarily agreed not to order JVC to begin performance of the contract until August 1, 1999; accordingly, Garufi's Motion for TRO in this proceeding is moot. Government Motion at 2. Plaintiff also filed a Motion for Expanded and Expedited Discovery with its Complaint seeking documents that were not before the GAO during its consideration of the protests. By Order of this court dated June 30, 1999, defendant was ordered to produce all materials "provided to and/or considered by and/or created by and/or relied on by the United States in evaluating offers and making the contract award...." After the government filed documents under the court's June 30, 1999 Order, plaintiff filed another Motion for Expanded and Expedited Discovery. An informal status conference was held on July 15, 1999 for clarification of the discovery issues and a formal status conference was held on the record on July 21, 1999. After reviewing defendant's Cross–Motion for Judgment on the Administrative Record and Op-

position to Plaintiff's Motion for Summary Judgment and hearing oral argument from counsel for both parties, the court denied plaintiffs discovery motion for the reason that the matters as to which discovery was requested were all addressed in the administrative record theretofore provided. Transcript of Status Conference ("Status Tr.") at 31–32. The court notes that the scope of an APA review of agency actions is generally limited to the administrative record developed by the agency. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). Given that the matters on which discovery was sought were addressed in the administrative record, no supplement to the administrative record is appropriate in this case. Cf. *Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339, 343 (1997).

mary Judgment on July 22, 1999. At the court's request, both parties also filed briefs addressing the issue of the competitive range on July 23, 1999. *See* Order, July 21, 1999. A hearing was held on the parties' cross-motions for judgment on the administrative record on July 26, 1999 at the National Courts Building in Washington, DC.

## II. Discussion

### A. The Scope and Standard of Review

This court has jurisdiction over Garufi's post-award bid protest action under the 1996 amendments to the Tucker Act. *See* 28 U.S.C. § 1491(b)(1) (Supp. 11 1996). The court reviews the challenged agency action according to the standards set out in the Administrative Procedure[s] Act ("APA"), 5 U.S.C. § 706 (1994). *See* 28 U.S.C. § 1491(b)(4). Accordingly, the court must determine whether or not defendant's actions toward Garufi were:

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law. . . .

5 U.S.C. § 706(2).

■ In determining whether the government has acted arbitrarily or capriciously towards Garufi, the court considers four criteria. *Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200, 1203–04 (1974): whether (1) there was subjective bad faith on the part of procurement officials; (2) there was not a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes or regulations were violated. *Id.; Metric Sys. Corp. v. United States*, 42 Fed. Cl. 306, 310 (1998). There is, however, "no requirement or implication . . . that each of the factors must be present in order to establish arbitrary and capricious action by the Government." *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir. 1988). Garufi must demonstrate by a preponderance of the evidence that defendant's

actions towards it were arbitrary and capricious. *See GraphicData, LLC v. United States*, 37 Fed.Cl. 771, 779 (1997) (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed.Cir.1988)).

■ Furthermore, "to prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." *Candle Corp. v. United States*, 40 Fed.Cl. 658, 665 (1998) (quoting *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996)); *see also Central Ark. Maintenance, Inc. v. United States*, 68 F.3d 1338, 1342 (Fed.Cir.1995) (only clear and prejudicial violations warrant relief). To demonstrate prejudice "the protester must show 'that there was a substantial chance it would have received the contract award but for the error.'" *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.1999) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir.1996)); *see also ACRA, Inc. v. United States*, 44 Fed.Cl. 288 (1999).

■ While a review of agency action under the APA requires a "thorough, probing, in-depth review" to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), contracting officials may nevertheless properly exercise wide discretion in their evaluation of bids and the application of procurement regulations. *See Electro–Methods, Inc. v. United States*, 7 Cl.Ct. 755, 762 (1985); *see RADVA Corp. v. United States*, 17 Cl.Ct. 812, 818 (1989), *aff'd without op.*, 914 F.2d 271 (Fed.Cir.1990). This discretion is especially broad in negotiated procurements, such as the one involved in the present case. *See CACI Field Servs., Inc. v. United States*, 13 Cl.Ct. 718, 726 (1987), *aff'd*, 854 F.2d 464 (Fed.Cir.1988). In this regard, "the court cannot substitute its judgment for that of the agency if reasonable minds could reach differing conclusions but must give deference to the agency's findings and conclusions." *CRC Marine Servs., Inc. v. United States*, 41 Fed. Cl. 66, 83 (1998). Indeed, "[t]he court should . . . intervene only when it is clearly deter-

mined that the agency's determinations were irrational or unreasonable." *Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983). As long as a rational basis is articulated and relevant factors are considered, the agency's action must be upheld. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

We decide this case on Garufi's and the government's cross-motions for summary judgment on the administrative record. Motions for judgment upon the administrative record are treated in accordance with the rules governing motions for summary judgment. *See* RCFC 56.1; *see Nickerson v. United States,* 35 Fed.Cl. 581, 588 (1996), *aff'd,* 113 F.3d 1255 (Fed.Cir.1997). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Secretary of Health and Human Services,* 998 F.2d 979, 982 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *Jay,* 998 F.2d at 982. If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562–63 (Fed.Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all

favorable inferences and presumptions run. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville,* 859 F.2d at 911 (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)). However, "[a] motion for summary judgment upon the administrative record, or for summary judgment, is an appropriate vehicle to scrutinize an agency's procurement actions because the issues are matters of contractual and regulatory interpretation." *Analytical & Research Technology, Inc. v. United States,* 39 Fed.Cl. 34, 43 (1997). In order to prevail, Garufi must show, on the basis of the administrative record, that the contract was awarded in violation of the standards of the APA. *See* 28 U.S.C. § 1491(b)(4). If the court finds instead that the contract was awarded without violation of the APA, the government is entitled to summary judgment. *Baird,* 1 Cl.Ct. at 662; *Bowman Transp.,* 419 U.S. at 285–86, 95 S.Ct. 438.

### B. The Parties' Motions for Summary Judgment

We now consider Garufi's Motion for and Memorandum in Support of Summary Judgment ("Garufi MSJ") filed on July 14, 1999 and the government's Cross–Motion for Judgment Upon the Administrative Record ("government Motion") filed on July 20, 1999. *See* RCFC 56.1.

Garufi has provided the court with several different distillations of the issues involved in this case. *See* Garufi MSJ at 4, 5. In outline, plaintiff's motions have focused on the following issues:

(1) Whether the government improperly evaluated Garufi's price proposal and the technical proposals of the successful awardee and Garufi;

(2) Whether Garufi was improperly eliminated from the competitive range;

(3) Whether the government failed properly to determine the responsibility of the successful awardee.

1. The Evaluation of Garufi and JVC Was Not Arbitrary and Capricious

Plaintiff argues that there was an improper evaluation of Garufi and JVC which resulted "in an incorrect decision to eliminate Garufi from the competitive range." Complaint at ¶ 6. The government argues that the Navy's decision to award the Contract to JVC was reasonable. Government Motion at 29.

a. Price Evaluation Board's Review of Garufi

■ Garufi's only allegation relative to the PEB is that it "improperly downgraded Garufi's proposal" in light of Garufi's insistence that economies of scale and predicted tax incentives would drive down costs in subsequent years of the contract. Garufi MSJ at 37.

The PEB evaluated Garufi's price/cost proposal for price reasonableness and had concerns about the projections for the four option years. AR at 1676–77. The PEB compared Garufi's proposal to the Government Estimate. Id. at 1676. Plaintiff argued that the government's GE was flawed because it "did not take into account the fact that the Italian Government may subsidize these companies" and the GE was also based on the cost of these services prior to the consolidated contract. Garufi MSJ at 35. The record makes clear that the PEB reviewed the GE and determined it to be reliable. AR at 1678. It appears to this court unreasonable to require the government to presume that tax incentives will be available in future years and entirely reasonable for the government to base its own estimate on the cost of such services in the past.

Plaintiff also argues that the GE is inflated due to lack of prior competition for the naval base's service contracts. Garufi MSJ at 34. This argument lacks force when the base period price that plaintiff proposes is in fact higher than the Government Estimate. It is primarily Garufi's figures for the four option years that demonstrated to the government's evaluators a lack of price reasonableness, including a lack of understanding of the management responsibilities and supply costs essential to the contract. AR at 2575–76.

In addition to comparing Garufi's price/cost proposal to the GE, the PEB compared Garufi's proposal to the other offerors. Id. at 1675–76. Such a comparison was specifically contemplated as a test of price reasonableness by the government's source selection plan. Id. at 1061. These comparisons demonstrated that Garufi's proposed costs for the option years were 31% lower than the government estimate and 14% lower than the next lowest offeror, JVC. Id. at 1676. The government's concern for the price reasonableness of Garufi's price/cost proposal in these circumstances cannot be characterized as arbitrary and capricious.

b. Technical Evaluation Board's Review of JVC

Plaintiff argues that "JVC's original offer was incorrectly evaluated, and the evaluation of JVC's revised proposal was not very different than their original proposal." Garufi MSJ at 13. In order for Garufi to complain about the evaluation of JVC's revised proposal, Garufi must be determined to be an interested party. The GAO found that Garufi qualified as an interested party only to the extent that it argues that JVC's proposal should have been rated Unacceptable. AR at 3057. However, the GAO determined that Garufi's argument about JVC's rating was not that it should have been eliminated from the competitive range due to lack of experience, but only that JVC's proposal should have been evaluated less favorably under the corporate experience subfactor. As such, the GAO found that Garufi's was not an interested party because Garufi would not be in a position to either participate in another round of discussions and submit a revised proposal or to participate in a resolicitation. AR at 3057–58.

The Federal Circuit has defined "interested party" as "an actual or prospective bidder who would have been in a position to receive the challenged award." *Federal Data Corp. v. United States*, 911 F.2d 699, 703 (Fed.Cir. 1990). As discussed below in Part II.A. 1.c., the court has determined that Garufi would not have been in a position to receive the challenged award. However, assuming ar-

guendo that Garufi is an interested party, the court considers the TEB's evaluation of JVC's technical proposal.

The TEB evaluated JVC's revised proposal to be Highly Acceptable overall, with five strengths and no weaknesses, significant weaknesses or deficiencies. AR at 2502.

The TEB rated JVC's revised proposal addressing Corporate Capability to be Highly Acceptable, with one previously attributed strength and one strength based on JVC's revised proposal. *Id.* Plaintiff disputes the previously attributed strength based on the TEB's finding that JVC is the "incumbent" to the extent noted by the TEB in its January 14, 1999 memorandum. Garufi MSJ at 15. AR at 1616. Plaintiff contends that JVC does not have the personnel to perform the contract. Garufi MSJ at 14. Given the fact that, as Garufi acknowledges, JVC handles "some work on the 9 of the 10 areas of the solicitation," (Garufi MSJ at 14) the court will not second guess the TEB's rating of such experience as a "strength." *Cf. Aero Corp. v. United States*, 38 Fed.Cl. 739, 770 (1997) ("the magnitude to be assigned a deficiency is within the discretion of defendant's contracting officials, this court will not now second-guess their decisions").

The other strength assigned to JVC under the Corporate Capability factor is due to a proposed subcontractor who possesses a certification required to perform the Weapons Ground Control Services as listed in the solicitation. AR at 2502. The TEB concluded that JVC "has a highly qualified team ... [and] has a high degree of potential to manage the CONSERV to ensure timely and quality services." *Id.*

The TEB rated JVC's Management factor to be Highly Acceptable with one previously identified strength. *Id.* The TEB found JVC to be responsive to the questions provided during discussions in that it provided more information on its proposed start-up plan and contingency plan. *Id.* at 2509–12. The TEB concluded that JVC "can provide a structure of available and experienced personnel capable and committed for the work, excellent planning capability, appropriate staffing, and can commence the required services without lapse on 1 April 1999." *Id.* at 2502

JVC received a Highly Acceptable rating with one strength from the TEB on the Quality Control components of its technical proposal. *Id.* JVC "provided a complete, extensive, and autonomously sound Quality Control Program/Organization, which displayed a keen insight and management understanding of the CONSERV contract and its requirements." *Id.* In response to discussions JVC provided, in its revised proposal, information regarding the experience of its site supervisor and quality control personnel, as well as organizational charts and descriptions of the its process for improving product quality. *Id.* at 2513–17.

The TEB rated the Corporate Financial Resources factor in JVC's revised technical proposal as Acceptable. *Id.* at 2502. Although the chart summarizing JVC's strengths and lack of weaknesses indicates that JVC received a strength for the Corporate Financial Resources factor, there is no indication that the TEB awarded JVC a strength for this category. The rating worksheets demonstrate that JVC's adjective rating is Acceptable for this factor with the appropriate rationale (*Id.* at 2518–20), but no mention of a strength in this category is noted other than in the summary chart. *Id.* at 2502. The TEB noted that letters of credit on behalf of JVC "indicate solid economical position" and "good volume of business." *Id.* at 2518–20.

Even if Garufi were found to be entitled to be treated as an interested party with respect to the government's evaluation of JVC, the government's evaluation of JVC was neither arbitrary nor capricious and does not provide a basis to afford Garufi relief.

c. Technical Evaluation Board's Review of Garufi

Plaintiff next argues that the government "improperly rated Garufi's technical proposal." Garufi MSJ at 4, 22–30. In discussing why JVC's ratings were improper, plaintiff compares its ratings to JVC's to demonstrate that it received inconsistent ratings because Garufi views its relative experience and capa-

bility as superior to JVC's. Garufi MSJ at 22–30.

The TEB's initial report evaluating Garufi's technical proposal had assigned it an overall rating of "Marginal." AR at 1613. After receiving Garufi's revision (AR at 2062–72), however, the TEB determined Garufi's overall technical rating to be "Unacceptable." *Id.* at 2499. The weaknesses, significant weaknesses and deficiencies still remaining in Garufi's technical proposal were noted by the TEB as follows:

| Garufi | Strength | Weakness | Significant Weakness | Deficiency |
|---|---|---|---|---|
| Corp. Capability | | 1 | | 1 |
| Management | | | 3 | 3 |
| Quality Control | | 1 | | 1 |
| Corp. Financial Resources | | | | |
| TOTAL | 0 | 2 | 3 | 5 |

*Id.* at 2500.

The TEB specifically addressed Garufi's revised proposal in each of the technical subfactors.

The TEB rated Garufi's Corporate Capability as marginal. *Id.* at 2500. Despite questions asking Garufi for specific corporate experience in managing a service contract similar in size, scope and dollar value, Garufi responded with conclusory statements and a notation of a contract with Telcom S.p.A. without any explanation of why that contract is relevant to the CONSERV contract. AR at 2555. The rating of Garufi's corporate capabilities was explained by the TEB in its report by noting:

> [a]lthough this Offeror received written technical questions pertinent to his technical proposal, and attended oral discussions intended to clarify the meaning of each of the technical proposal questions, the response provided by the Offeror failed to clear up the majority of the previously identified weaknesses, significant weaknesses, and deficiencies. The TEB now believes this Offeror clearly does not understand this type of Service Contract in terms of it's [sic] size and scope, and the type of management structure and management capability required to ensure the project's success. The TEB now believes it is a very low probability that this Offeror has the corporate and management capability to successfully manage the CON-

SERV and considers this area to be a Deficiency.

AR at 2500. Also under the Corporate Capability factor, the TEB requested missing information on some of the subcontractors who would perform the work under the contract. The TEB noted that information was still missing on this point so a "weakness" assessment remained. AR at 2555.

The majority of the TEB's concerns were about Garufi's management. *Id.* at 2555–57. Six questions were asked of Garufi during discussions and none of Garufi's responses resolved the TEB's concerns. *Id.* at 2556–57. As a result, all the initially assigned deficiencies, weaknesses and significant weaknesses to the Management factor remained in Garufi's proposal. *Id.* Among the TEB's concerns were the functions and experience of Garufi's Technical Director, Contractor's Representative and Project Manager. *Id.* at 2556. Moreover, Garufi provided no documentation of the experience of its shift managers nor any evidence that it was committing enough dedicated management personnel for the successful performance of the large service contract. *Id.* Accordingly, the TEB rated Garufi's Management as "Marginal." *Id.* at 2555. These concerns all appear to the court to be reasonable in the light of the size and purpose of the contract.

Despite specific requests for information during discussions, Garufi failed to provide the TEB with information documenting the experience of Garufi's Key Quality Control inspector and failed to establish that the quality control organization operated autonomously. AR at 2557. Moreover, the TEB found that Garufi did not provide any information regarding procedures for improving quality, which was a specific question posed during discussions. AR at 2557. In the light of these deficiencies, the TEB gave Garufi a "Marginal" rating on the Quality Control factor. AR at 2557.

The TEB upgraded Garufi's technical proposal on the Corporate Financial Resources factor because Garufi provided the additional references requested during discussions. AR at 2557. Garufi received an "Acceptable" rating for the fourth factor. AR at 2557.

After evaluating Garufi's entire revised technical proposal, the TEB found that Garufi did not sufficiently understand the nature of the contract and the required management structure and capability to ensure successful performance. AR at 2557.[7]

Rather than demonstrating that the TEB acted in bad faith when evaluating its proposal, Garufi's arguments show that it simply disagrees with the evaluation of its proposal. In *Aero Corp. v. United States*, 38 Fed.Cl. 739 (1997), the court stated that, "in reviewing government procurement decisions, 'there is a strong presumption that government officials act properly and in good faith.'" *Id.* at 749 (quoting *Finley v. United States*, 31 Fed.Cl. 704, 706 (1994)). This presumption is not rebutted where plaintiff disagrees with the manner in which defendant considered its proposal. *See Aero*, 38 Fed.Cl. at 749 (citing *Finley*, 31 Fed.Cl. at 706). In order to be set aside, the evaluation must be arbitrary and capricious, not merely unsatisfactory to a disappointed offeror. We agree with the Comptroller's finding that "the agency reasonably concluded that the protester's initial proposal and responses to discussion questions ... indicated a lack of understanding of the contract's requirements." AR at 3056.

Like Garufi, plaintiffs in *Aero* also complained that their proposal received inconsistent treatment during the evaluation process. *Aero*, 38 Fed.Cl. at 747. The *Aero* plaintiff asserted that the "other offerors' proposals contained weaknesses similar to those identified for ... plaintiff's proposal, but that those proposals were not marked down as severely as plaintiff's proposal, much less eliminated from the competitive range." *Id.* at 768. The court in *Aero* concluded that the plaintiff had "failed to show, by clear and convincing evidence, that its proposal was subject to disparate treatment" that would be tantamount to arbitrary and capricious actions *Id.* at 769. *See Finley*, 31 Fed.Cl. at 706 (citing *LaStrada Inn, Inc. v. United States*, 12 Cl.Ct. 110, 113–14 (1987) (mere disagreement does not equal bad faith)).

Based on the finding that the disappointed offeror had "not demonstrated that defendant acted with a specific intent to injure plaintiff during the competitive range evaluation process," the *Aero* court concluded that the "contracting officials did not act in bad faith in deciding to exclude plaintiff's proposal from the competitive range." *Aero*, 38 Fed.Cl. at 749–50. Similarly, Garufi has not offered any evidence of the government's specific intention to injure it. The record before the court contains a "Consistency Checklist" for each TEB evaluator that notes, among other things, "All Evaluators Were Evaluated Consistently." AR at 2559–2560. It is not unreasonable to conclude that the evaluators consistently applied the review standards.[8]

---

7. The plaintiff, particularly in its final brief, makes much of the fact that the TEB had, after Garufi submitted its post-discussion revisions, prepared a list of ten questions to be asked in the event that Garufi remained in the competitive range. Garufi CR Memo at 3; AR at 2557–58. These additional comprehensive questions only serve to underscore the vast amount of information the TEB found lacking in Garufi's revised proposal. AR at 2557–58.

8. Plaintiff has also argued that recent federal circuit authority provides support for setting aside this procurement. Plaintiff's Motion for a Temporary Restraining Order filed June 28, 1999 ("Plaintiff's TRO") at 36 (citing *Alfa Laval*, 175 F.3d 1365 (Fed.Cir.1999)). The test used in *Alfa Laval* requires both that there be a significant error in the procurement and that there be a substantial chance that the protester would have received the award. *Alfa Laval*, 175 F.3d at 1367 (citing *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed.Cir.1996); *and Data Gen.*

*Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir. 1996)). Plaintiff here meets neither requirement of *Alfa Laval*. First, we have found no error in the Navy's conduct of the procurement. Second, as a matter of law, Garufi did not have a "substantial chance" of receiving the award. The solicitation provided that "[a] proposal must be rated at least 'acceptable' to be eligible for award." AR at 1684. Because Garufi never submitted an acceptable proposal it did not have a "substantial chance" of receiving the award. *See Statistica*, 102 F.3d at 1581; *Data Gen.*, 78 F.3d at 1562. *Alfa Laval* is also distinguishable from the case at bar because in *Alfa Laval* the protester successfully argued that the awardee's proposal was unacceptable in terms of its technical compliance. However, Garufi only argues that both its offer and JVC's were similar, i.e., "[i]f the agency was correct in the decision to evaluate Garufi as Unacceptable, then JVC should also have been evaluated as Unacceptable, because their proposals were similar." Garufi Reply at 12.

**2. The Government's Elimination of Garufi from the Competitive Range Was Not Improper**

Plaintiff's second issue is whether the contracting officer established an initial competitive range of three offerors or only one offeror. The government's position is that the SSB established an initial competitive range of three offerors, from which Garufi was eliminated after discussions. Government Motion at 11–12. The government argues that Garufi was included in the initial competitive range as evidenced by the resulting discussions held with Garufi, the revised proposal submitted by Garufi and the evaluation of Garufi's responses to discussions and clarifications prior to the award of the contract to JVC. *Id.* at 38.

Plaintiff suggests that there was only one competitive range established "when the Navy pursuant to Far [sic] § 15.306(c) evaluated the proposals, conducted some sort or form of discussions which we allege were not done properly, but nevertheless then, at that point eliminated both [Offeror 3], and Garufi from the competitive range." Garufi Memorandum on Competitive Range ("Garufi CR Memo") at 1.[9] Plaintiff's position is that, because a competitive range of only one offeror was established, a higher standard of judicial scrutiny of the government's actions is warranted in this case. Garufi MSJ at 39 (citing FAR § 15.609 and *Rockwell Int'l Corp. v. United States*, 4 Cl.Ct. 1, 5 (1983)).

■ The court agrees that when there is an initial competitive range of one, judicial scrutiny is heightened. *See, e.g., Birch & Davis*, 4 F.3d at 974 ("If the contracting officer has determined an initial competitive range of one, there must be a clear showing that the excluded bids have 'no reasonable chance' of being selected."). However, the record does not support plaintiff's assertion that "an initial competitive range of one" was established in this procurement.

■ According to the record before the court, Garufi, JVC and [Offeror 3] were all included in the initial competitive range. AR

at 1694, 2030. Under the source selection plan for this procurement, "[w]hen negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions." AR at 1065. In accordance with the source selection plan, the government held discussions with the offerors in the competitive range. *Id.* at 1694, 2039, 2580. Then the revised proposals were received and evaluated. AR at 2580. Only after discussions were held and evaluation of revised proposals were made was Garufi eliminated from the competitive range. *Id.* at 2753; *cf. Data Base Architects, Inc. v. United States*, No. 90–0787, 1990 U.S. Dist. LEXIS 8867, at *10 (D.C. May 24, 1990) (evaluation of plaintiff's proposal made after award). Accordingly, the "close scrutiny" appropriate for an "initial competitive range of one" does not apply. In situations where discussions have been held, the relevant FAR provision is § 15.306(d)(4), which states in pertinent part:

> If, after discussions have begun, an offeror originally in the competitive range is no longer considered to be among the most highly rated offerors being considered for award, that offeror may be eliminated from the competitive range whether or not all material aspects of the proposal have been discussed, or whether or not the offeror has been afforded an opportunity to submit a proposal revision.

FAR § 15.306(d)(4) (1998).

Since the FAR allows for eliminations from the competitive range to occur at any time after discussions have begun, an inquiry into Garufi's claim that it did not have enough time to "properly answer the technical questions posed to them" (Complaint at ¶ 116) is not necessary. The contracting officer was not precluded from eliminating Garufi even before its submission of its revised proposal.

In addition to authorizing the contracting officer to eliminate offerors before the submission of revised proposals, the FAR specifically affords contracting officers great latitude in determining the scope and extent of discussions held with offerors in the competi-

---

9. The very language plaintiff uses to argue its point underscores the difficulty in its position. Plaintiff describes Garufi's being "eliminated ...

[from] the competitive range" (Garufi CR Memo at 1) while at the same time insisting that the Navy established a competitive range of one.

tive range. "The contracting officer shall ... indicate to, or discuss with, each offeror still being considered for award, significant weaknesses, deficiencies, and other aspects of its proposal ... that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. *The scope and extent of discussions are a matter of contracting officer judgment.*" FAR § 15.306(d)(3) (emphasis added). Garufi's complaint is particularly inapposite given the fact that the government received and fully evaluated Garufi's revised proposal before Garufi was eliminated from the competitive range.

■■■ Plaintiff argues that "the contracting officer should have conducted *another round* of discussions and negotiations, which should have been meaningful." Garufi MSJ at 38–39 (emphasis added). This argument concedes the point that discussions and negotiations were conducted with Garufi, [Offeror 3] and JVC. Plaintiff's argument does not criticize the discussions and negotiations conducted with it on February 22, 1999. Rather, plaintiff argues that more discussions and negotiations should have occurred "which could have led to the further clarification and inclusion of Garufi." *Id.* at 38. This argument would have the court require contracting officers to engage in subsequent rounds of discussions and revised proposals if a disappointed offeror believes that additional rounds of discussions could somehow help it to construct an acceptable proposal. This is not what the law requires. The record is clear that in its revised proposal Garufi was repeatedly non-responsive to requests of the TEB and PEB for clarification, requests plainly stated in numerous questions. AR at 2500–01, 2577. The court declines to find that the contracting officer acted arbitrarily and capriciously in determining the scope and extent of discussions. The FAR specifically provides that such determinations are "a matter of contracting officer judgment." FAR § 15.306(d)(3).

■■■ The only remaining question regarding Garufi's elimination from the competitive range is whether the discussions held in February were, in fact, meaningful. The case law addressing the "meaningfulness" of competitive range discussions focuses on whether the government notified the offerors of its concerns about the proposals. This court recently noted that "discussions are meaningful if they generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit." *Advanced Data Concepts, Inc. v. United States,* 43 Fed.Cl. 410, 422 (1999). The discussions held with Garufi on February 22, 1999 specifically highlighted the areas of its proposal which needed amplification and clarification. AR at 2044–47.[10] Accordingly, the discussions held with Garufi satisfy the meaningfulness requirement.

■■■ Garufi also complains in its brief that it did not have enough time to respond and was not given an opportunity to improve its proposal. Garufi CR Memo at 3. Garufi argues that the government knew that all the information needed for the revised proposal had to be collected from the subcontractors and that the government did not give it enough time to respond in its revised proposals to questions asked by the evaluators. Garufi MSJ at 4, 32. Plaintiff cites no case law or statute that establishes a minimum time necessary to qualify as an "opportunity to improve." The court notes that any burdens imposed by the schedule for response fell equally on all of the three remaining offerors, all of whom responded within the deadline. Plaintiff has proffered no evidence suggesting the government acted in bad faith or intentioned to treat Garufi unfairly by imposing the time limit. The court cannot find that the government's imposition of a one week time limit for response was arbitrary or capricious or an abuse of discretion.

■■■ The elimination of Garufi from the competitive range appears to this court to

10. In both the letter sent to Garufi before the oral negotiations (AR at 2044–45) and at the oral negotiations attended by Vincenzo Garufi, Domenico Garufi and Joseph Interdonato (AR at 2039–40) the government's contracting officials addressed specific questions arising from Garufi's proposal that needed clarification.

have been within the contracting officer's sound discretion. *See W & D Ships Deck Works, Inc. v. United States,* 39 Fed.Cl. 638, 642–43 (1997). In *W & D* the court found that "it is within an agency's discretion to exclude a technically unacceptable proposal from the competitive range even if it is from the low price bidder." *Id.* at 645. The aggrieved low bidder in *W & D* also complained that it should not have been excluded. There, the court ruled that the government properly excluded a proposal from the competitive range when the proposal would need "major revisions" to become technically acceptable. *See id.; Control Data Corp.,* B–209166.2, 1983 WL 31693 (C.G. Dec. 27, 1983) (upholding rejection of proposal from disappointed offeror who was initially included in competitive range and given opportunity to correct deficiencies through discussions). Here, the evaluators found that "this proposal requires a complete rewrite in order to be made acceptable." AR at 2557.

3. The Contracting Officer Made a Valid Determination of Awardee's Responsibility

 The third issue plaintiff presses in its protest is that the contracting officer "never made a determination that JVC was presently responsible" because the CO failed to consider the import of various criminal allegations concerning a prior principal of the component entities of the JVC joint venture. Complaint at ¶ 5. However, the record before the court contains the contracting officer's unambiguous written determination of JVC's responsibility. AR at 2741. In this document, Mr. Sellman specifically notes that JVC was "not on the list of 'Parties Excluded from Procurement Programs,'" and that JVC had "a satisfactory record of performance, integrity, and business ethics." *Id.*

Not only is there clear evidence of the CO's determination, but the FAR also provides that the CO's "signing of a contract constitutes a determination that the prospective contractor is responsible with respect to that contract." FAR § 9.105–2.

. Plaintiff further argues that the contracting officer "improperly determined JVC's present responsibility for a contract of this size and scope ... [thus] that responsibility determination is totally lacking in reason and cannot be upheld." Plaintiff's Reply, filed on July 23, 1999 ("Plaintiff's Reply"), at 3. Plaintiff particularly alleges that JVC lied on its Certifications Regarding Debarment, Suspension, Proposed Debarment, and Other Responsibility Matters ("JVC's Certifications"). Garufi MSJ at 12. Plaintiff cites no precedent from this court or the Court of Appeals for the Federal Circuit to support its argument that the court should entertain a challenge of the contracting officer's documented responsibility determination,[11] but rather focuses on a document in the record from an Italian court proceeding regarding Mafia-related allegations of past improper conduct on the Sigonella Naval Base to support its claim that the CO's determination was improper. AR at 3879–87.[12] Plaintiff's allegations have focused on Carmelo LaMastra, his son Salvatore LaMastra and Giovanni Schiavo. Plaintiff's Reply at 3–10.

The defendant argues that, given the regularity of the government's documentation and absent allegations that the contracting officer "acted with a specific intent toward injuring Garufi," the court is required to dismiss the argument by governing precedent. Government Motion at 34 (citing *Trilon Educational Corp. v. United States,* 217 Ct.Cl. 266, 271, 578 F.2d 1356 (1978) ("even had the contracting officer been cognizant of Mr. Coe's criminal conviction, he would still not have been

11. Plaintiffs reliance on *Action Service Corp. v. Garrett,* 790 F.Supp. 1188 (D.P.R.1992), where the Puerto Rico District Court appears to apply a less deferential standard to a responsibility determination, even if it were binding precedent on this court, is misplaced. Unlike this case, the contracting officer in *Garrett* "admitted that he had not performed a responsibility determination." *Id.* at 1196. In those circumstances, the *Garrett* court held "that the Navy's failure to perform a responsibility analysis constitutes clear

error." *Id.* By contrast, the CO in this case made a clear responsibility determination.

12. The court notes and the parties do not dispute that the improper conduct including intimidation and bid-rigging in the Italian court documents in the record does not involve the current procurement at Sigonella Naval Base. *See* Transcript of Oral Argument, July 26, 1999, ("Oral Argument") at 7, 11, 18.

compelled to make a determination of nonresponsibility ... to [his] subsidiary firm")). At oral argument, the government further argued that because JVC had an Italian court-appointed administrator, the court need not inquire further about any allegations of Mafia relations or prior convictions.[13] Oral Argument at 32–38 ("these companies have been taken over ... who owns these companies is really irrelevant in a circumstance like this ... the issue to be decided is whether there was bad faith or fraud.").

While noting the traditionally deferential treatment of contracting officers' determination of responsibility, the court examined all the documents in the administrative record which were relied on by the contracting officer in determining JVC's responsibility. In view of the inflammatory nature of the allegations regarding one Carmelo LaMastra, who appears to have been a principal at some time of at least two of JVC's component entities, the court also reviewed whether JVC's Certifications were consistent with the information available to the contracting officer.

Plaintiff argues that Salvatore LaMastra, the son of Carmelo LaMastra, is the "owner" of JVC based on AR at 3860, 3927, and 3928 (Oral Argument at 11–13). The documents do not support such a conclusion. These documents only establish that in 1998, Salvatore LaMastra could act as an agent for these companies and sign documents for them. *Id.* The available records do not explain the relationship between the Italian court-appointed legal administrators and a signatory agent. Oral Argument at 16. Neither the court nor the CO are required to conclude on this record that acting as a signatory agent constitutes ownership.

Plaintiff has also made inflammatory allegations against Mr. Schiavo, a member of the Technical Evaluation Board in this procurement. Plaintiff's Reply at 4. Those allegations also fail of support in the record. Mr.

Schiavo is indeed mentioned in the Italian court record describing Mr. Carmelo LaMastra's assets and activities. Mr. Schiavo's role, however, was in the nature of a witness for the prosecution of wrongdoing. Oral Argument at 20 (Plaintiff's counsel conceding Mr. Schiavo's role was "giving testimony against certain individuals, specifically LaMastra, or his companies, or both.").

On examination of the record, the court finds nothing which required a determination that facts available to the Navy conflicted with the representations filed by the awardee. There are also no allegations of fraud or bad faith on the part of the contracting officer. *See Trilon Educational Corp. v. United States,* 217 Ct.Cl. 266, 578 F.2d 1356 (1987); *see also Universal Technologies, Inc., Spacecraft, Inc.,* 1992 WL 278888(C.G) *9–10 (CPD Sept. 28, 1992). The court cannot find on this record that the government's failure to find JVC non-responsible amounted to arbitrary and capricious action. The determination of responsibility appears instead to be consistent with the information developed in the procurement process.

III. Conclusion

Accordingly, based on the foregoing, it is ORDERED, as follows:

1. Garufi's Motion for Summary Judgment is DENIED. The government's Cross-Motion for Judgment Upon the Administrative Record is GRANTED. The Clerk of the Court shall enter judgment for the government.

2. On or before Friday, August 6, 1999, the parties shall file requests for deletion of protected/privileged material from the published opinion to be issued by the court.

3. Each party shall bear its own costs.

---

13. JVC's Offer and Representations and Certifications were signed by the Legal Administrator, Avv. Teodoro Pema, on behalf of JVC. AR at 1371–80, 2743–46, 3862–71, 3913–22. The Joint Venture Agreement is a document in the record which states that JVC was formed by three entities: ALRA s.r.l.; Impredil Construzioni s.r.l.,

and Bosco Eineo-societa co-opertiva di produzione lavoro a.r.l. *Id.* at 3991–97, 3934–37, 3904–12, 3896–3903, 3898, 3888–95. The Joint Venture Agreement authorizes the court-appointed Legal Administrator, Teodoro Pema to represent and run the joint venture without limitation or exception. AR at 4010–11.